**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LIVING DESIGNS, INC. and PLANT
EXCHANGE, INC., Hawai'i
corporations,
                    *Plaintiff-Appellant,*

            v.

E.I. DUPONT DE NEMOURS AND
COMPANY, a Delaware corporation,
                    *Defendant-Appellee.*

No. 02-16947

D.C. No.
CV-99-00660-MLR

ANTHURIUM ACRES, a Hawai'i
general partnership, successor in
interest to Island Tropicals;
MUELLER HORTICULTURAL PARTNERS,
a Hawai'i limited partnership,
                    *Plaintiffs-Appellants,*

            v.

E.I. DUPONT DE NEMOURS AND
COMPANY, a Delaware corporation,
                    *Defendant-Appellee.*

No. 02-16948

D.C. No.
CV-00-00615-MLR

MCCONNELL, INC., a California
corporation,
                    *Plaintiff-Appellant,*

            v.

E.I. DUPONT DE NEMOURS AND
COMPANY, a Delaware corporation,
                    *Defendant-Appellee.*

No. 02-16951

D.C. No.
CV-00-00328-MLR

15635

LIVING DESIGNS, INC. and PLANT
EXCHANGE, INC., Hawai‘i
corporations; DAVID MATSUURA,
individually and dba Orchid Isle
Nursery; STEPHEN MATSUURA,
individually and dba Hawaiian
Dendrobium Farm; FUKU-BONSAI,
INC.; DAVID W. FUKUMOTO; LIVING
DESIGNS, INC. and PLANT
EXCHANGE, INC.; McCONNELL, INC.,
a California corporation;
ANTHURIUM ACRES, a Hawai‘i
general partnership, successor in
interest to Island Tropicals;
MUELLER HORTICULTURAL PARTNERS,
          *Plaintiffs-Appellants,*

                v.

E.I. DUPONT DE NEMOURS AND
COMPANY, a Delaware corporation,
          *Defendant-Appellee.*

No. 04-16354

D.C. Nos.
CV-96-01180-MLR
CV-97-00716-MLR
CV-99-00660-MLR
CV-00-00328-MLR
CV-00-00615-MLR

OPINION

Appeal from the United States District Court
for the District of Hawai‘i
Manuel L. Real, District Judge, Presiding

Argued and Submitted
July 11, 2005—San Francisco, California

Filed December 5, 2005

Before: Sidney R. Thomas, Barry G. Silverman, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Thomas

**COUNSEL**

Stephen T. Cox, Cox & Moyer, San Francisco, California, for the plaintiffs-appellants.

C. Stephens Clay and James F. Bogan III, Kilpatrick Stockton LLP, Atlanta, Georgia, for defendant-appellee.

## OPINION

THOMAS, Circuit Judge:

In these consolidated cases, Plaintiffs Living Designs, McConnell, Inc., Anthurium Acres, Matsuura, and Fuku-Bonsai allege that Defendant E.I. DuPont de Nemours and Company ("DuPont") fraudulently induced the settlement of their prior products liability litigation. We reverse the district court's grant of judgment on the pleadings in favor of DuPont on Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO"), and the district court's grant of summary judgment in favor of DuPont on Plaintiffs' state tort claims.

I

A

Outside of the agricultural community, plant disease-causing fungi are rarely the subject of casual dinner conversation, much less contentious litigation. Yet to farmers worldwide, the problems posed by white mold, virulent black leg, foot rot, and scab are extremely serious matters. In the late 1950s and early 1960s, DuPont developed a systemic fungicide to combat these problems, which it marketed under the name of Benlate. At the zenith of its use, Benlate was one of DuPont's most successful commercial products.

However, into every product's life, a little rain must fall. In the case of Benlate, the rain became a torrent of litigation alleging that Benlate had become contaminated with the herbicide sulfonylureas ("SUs") during the manufacturing process, resulting in widespread crop damage.

In previous litigation filed in 1992 and 1993, Plaintiffs, who are commercial nurserymen, separately sued DuPont alleging that contaminated Benlate had killed their plants. *Matsuura v. Altson & Bird* (*Matsuura I*), 166 F.3d 1006, 1007, *amended by* 179 F.3d 1131 (9th Cir. 1999).

> Many similar suits were filed by commercial growers across the nation. In early trials, DuPont falsely represented that soil tests had produced no evidence of contamination. During consolidated discovery proceedings in Hawai'i, which included the [Plaintiffs'] suits, DuPont falsely denied withholding evidence of Benlate contamination, and improperly invoked work product protection to resist disclosure of testing data.

*Id.*

Plaintiffs, represented by Florida attorney Kevin Malone, settled their Benlate product liability cases against DuPont in April of 1994.[1] Plaintiffs did not dismiss their claims with prejudice until October and November of 1994. *Matsuura v. E.I. du Pont de Nemours & Co. (Matsuura III)*, 330 F. Supp. 2d 1101, 1120 (D. Haw. 2004). After Plaintiffs settled their product liability claims against DuPont, it became clear that DuPont had not revealed to Plaintiffs during discovery damaging test results that indicated that Benlate was indeed contaminated with SUs. There are three different categories of tests concealed, withheld, and lied about by DuPont in the course of litigating Benlate cases across the country.

   1.   *Alta Test Results.* The results of tests conducted

---

[1]Plaintiff Fuku-Bonsai signed a settlement agreement with DuPont on April 22, 1994. The month prior, on March 6, 1994, Fuku-Bonsai had been forced to file for bankruptcy under Chapter 11. The settlement between Fuku-Bonsai and DuPont was approved by the bankruptcy court on May 16, 1994.

by Alta Analytical Laboratories ("Alta") showed that farms where Benlate had been used were contaminated with SUs. "Alta laboratories was one of the few laboratories, if not the only one, capable of performing the sophisticated soil and water analysis to determine if Benlate was contaminated with [SUs]." *Matsuura v. E.I. du Pont de Nemours & Co.* (*Matsuura II*), 73 P.3d 687, 689 n.5 (Haw. 2003).

2.   *Costa Rica field tests.* DuPont conducted field tests of Benlate in Monte Vista, Costa Rica in 1992. During the Costa Rica field tests, the plants treated with Benlate died, demonstrating that Benlate was harmful to plants. DuPont destroyed the plants subjected to these field tests and withheld evidence of the field test results. *Productora de Semillas, S.A. v. E.I. du Pont de Nemours, & Co.*, No. 97-12186 CA 23 (Fla. Cir. Ct. June 30, 2001) (order on Plaintiff's motion to strike defendant DuPont's pleadings and on Plaintiff's motion for sanctions against DuPont for the destruction of the Monte Vista Benlate test).

3.   *BAM results.* These tests were performed on behalf of DuPont by A&L Midwest laboratories and by DuPont's in-house testing facilities. These tests also showed that Benlate was contaminated with SUs. *Kawamata Farms, Inc. v. United Agri Products*, 948 P.2d 1055, 1065 (Haw. 1997) (referring to the Keeler documents).

DuPont first produced Alta test results showing Benlate contamination in May 1994 to Benlate plaintiffs who had not yet settled their cases, such as to plaintiffs in the *Kawamata/Tomono* case,[2] over which Judge Ibarra presided in the Third

---

[2]*See Kawamata Farms*, 948 P.2d at 1065. In *Kawamata Farms*, the plaintiffs, sellers and distributors of agricultural products in Hawai'i, alleged that their plants, soil, and farm structures had been damaged by Benlate. In January 1995, a jury issued a verdict in favor of the plaintiffs on their negligence and products liability claims, awarding $1,180,000 in compensatory damages and $1,770,000 in punitive damages.

Circuit Court in Hawai'i. *Matsuura II*, 73 P.3d at 689.[3]

> Contrary to DuPont's prior representations, the tests confirmed that Benlate was contaminated. Additional evidence of Benlate contamination was produced in other Benlate litigation. Two district courts held that DuPont had intentionally engaged in fraudulent conduct by withholding this evidence. *See Kawamata Farms v. United Agri Prods.,* 86 Hawaii 214, 948 P.2d 1055, 1083, 1087-88 (1996) (imposing $1.5 million punitive sanction for discovery abuse), *aff'd,* 86 Hawaii 214, 948 P.2d 1055 (Haw. 1997); *Bush Ranch v. E.I. DuPont de Nemours & Co.* (*In re DuPont*) ("*Bush Ranch*"), 918 F. Supp. 1524, 1556-58 (M.D. Ga. 1995) (imposing sanctions potentially totaling $115 million), *rev'd on other grounds,* 99 F.3d 363 (11th Cir. 1996). Although the Eleventh Circuit reversed the Georgia court on the ground that the sanctions were punitive and the court had not followed applicable criminal procedure, the court noted the "serious nature of the allegations" and stated that it assumed the U.S. Attorney would conduct an investigation, *In re E.I. DuPont,* 99 F.3d at 369 n. 7. On remand, the district court asked the United States Attorney to "investigate and prosecute" DuPont for criminal contempt, *In re E.I. du Pont,* No. 4:95-CV-36 (HL) (M.D. Ga. Nov. 4, 1998) (order referring matter to U.S. Attorney), but the court ultimately approved a civil settlement resolving the matter, which required DuPont and Alston & Bird to make payments totaling $11.25

---

[3]The Hawai'i Supreme Court in *Kawamata Farms*, describes in detail the discovery disputes and Plaintiffs' gradual discovery of withheld evidence in this case. 948 P.2d at 1065-66. Although Plaintiffs in this case state that the Alta test results were produced on May 17, 1994, it should be noted that production of the test results demonstrating the Benlate contamination and DuPont's knowledge of the contamination occurred bit by bit from May through December of 1994.

million, *see In re E.I. du Pont,* No. 4:95-CV-36 (HL) (M.D. Ga. Dec. 31, 1998) (consent order and final judgment).

*Matsuura I*, 166 F.3d at 1007-08.

DuPont was first sanctioned by Judge Elliot, who presided over the *Bush Ranch* litigation in the United States District Court for the Middle District of Georgia, on August 21, 1995 for (1) intentionally withholding evidence of the SU contamination of Benlate that was in its possession and which it was ordered to produce and (2) for falsely representing to the court and to plaintiffs that the Alta documents it withheld contained no evidence of SU contamination. *Bush Ranch*, 918 F. Supp. at 1555-1558.

B

After learning that DuPont fraudulently withheld evidence of Benlate's contamination, Plaintiffs filed the instant actions in the United States District Court for the District of Hawai'i, asserting claims under RICO and state common law claims of fraud, conspiracy, misrepresentation, abuse of process, infliction of emotional distress, interference with prospective economic advantage, negligence, and spoliation of evidence. In sum, Plaintiffs alleged that DuPont fraudulently withheld evidence of Benlate's contamination to induce Plaintiffs to settle their underlying Benlate litigation. Plaintiffs allege they were harmed by DuPont's fraudulent conduct "because they would have requested more money or refused to settle had they known about the concealed data." *Matsuura II*, 73 P.3d at 691.

The district court[4] granted DuPont's judgment on the pleadings, ruling the suit was barred by releases signed by Plain-

---

[4]The presiding judge at this stage of the litigation was Hon. David Ezra, Chief Judge of the District of Hawai'i.

tiffs as part of their settlement agreements with DuPont. *Matsuura I*, 166 F.3d at 1008. Furthermore, "the court held [Plaintiffs] could have rescinded the settlement agreements because of DuPont's fraud, but forfeited that remedy by failing promptly to tender the settlement proceeds." *Id.*

Plaintiffs appealed. We reversed, holding that Delaware law controlled and that the Delaware Supreme Court would likely interpret the releases as not barring a claim for fraudulent inducement. *Id.* at 1011. We also held that, under Delaware law, plaintiffs alleging that they were fraudulently induced to settle their claims have a choice of remedies: they may either (1) rescind the settlement agreement or (2) affirm their settlement agreements and sue for fraud. *Id.* at 1012.[5]

Proceedings continued on remand in federal court. As summarized by the Hawai'i Supreme Court:

> On March 1, 2001, the [Plaintiffs] filed a "Motion for Collateral Estoppel to Preclude Defendant from Re-Litigating Previously Adjudicated Findings of Fraud, Discovery Abuse, and Intentional Withholding of Evidence in the *Kawamata Farms* case" (motion for collateral estoppel). Therein, the [Plaintiffs] seek to preclude DuPont from "re-litigating" the following issues: (1) that DuPont fraudulently and intentionally withheld the Alta test results from Benlate litigants; (2) that DuPont intentionally withheld the Keeler documents from Benlate litigants; and (3) that the Alta test results included analytical findings, which some experts would construe as evidence that Benlate was contaminated with SUs. The [Plaintiffs] claim that issues (1) and (2) have already been decided in *Kawamata Farms* and that issue (3)

---

[5]Our interpretation of Delaware law was confirmed as correct in *E.I. du Pont de Nemours & Co. v. Florida Evergreen Foliage*, 744 A.2d 457 (Del. 1999).

was decided by the Eleventh Circuit in *Bush Ranch II*.

*Matsuura II*, 73 P.3d at 691. In response, DuPont filed two "related or counter motions." *Id.* First, DuPont filed a "Motion for Judgment on the Pleadings as to All Plaintiffs' Claims Based on Litigation Conduct," asserting that Plaintiffs' claims were barred by the doctrine of litigation immunity and that Hawai'i has not recognized a separate tort of spoliation of evidence. *Id.* Second, DuPont filed a "Motion for Summary Judgment Based on Plaintiffs' Inability as a Matter of Law to Establish Reasonable Reliance," asserting that reasonable reliance is an element of a fraudulent inducement claim and that Plaintiffs were unable, as a matter of law, to establish that they reasonably relied on DuPont's representations made during litigation. *Id.*

On May 10, 2001, less than one week before the hearing on the substantive motions, DuPont filed a motion to certify questions of Hawai'i state law to the Hawai'i Supreme Court. Judge Ezra agreed and certified three questions to the court. *Matsuura II*, 73 P.3d at 692. The Hawai'i Supreme Court responded on July 29, 2003. The questions and the Hawai'i Supreme Court's answers are as follows.

The first question certified asked: "Under Hawai'i law, is a party immune from liability for civil damages based on that party's misconduct, including fraud, engaged in during prior litigation proceedings?" *Id.* at 688. The Hawai'i Supreme Court submitted the following answer: "Under Hawai'i law, a party is not immune from liability for civil damages based upon that party's fraud engaged in during prior litigation proceedings." *Id.* at 700.

The second certified question asked: "Where plaintiffs' attorneys and others have accused the defendant of fraud and dishonesty during the course of prior, related litigation, are plaintiffs thereafter precluded as a matter of law from bring-

ing a cause of action for fraudulent inducement to settle because they should not have relied on the Defendant's representations? *Id.* at 688-89. The Hawai'i Supreme Court submitted the following answer: "In an action for fraudulent inducement where plaintiffs' attorneys and others have accused the defendant of fraud and dishonesty during the course of prior dealings, plaintiffs are not precluded as a matter of law from establishing that their reliance on the defendant's representations was reasonable." *Id.* at 704.

The third and final certified question asked: "Does Hawai'i law recognize a civil cause of action for damages for intentional and/or negligent spoliation of evidence?" *Id.* at 689. The Hawai'i Supreme Court responded:

> Because the facts alleged cannot support their spoliation claim, this court need not resolve whether Hawai'i law would recognize a tort of spoliation of evidence. Therefore, insofar as the third certified question does not appear to be "determinative of the cause," it was inappropriate for certification under HRAP Rule 13. Accordingly, we decline to answer it.

*Id.* at 706 (citations omitted).

Prior to the Hawai'i Supreme Court's response to the certified questions, visiting Judge Manuel Real of Los Angeles, who replaced Chief Judge Ezra as the judge assigned to this case, denied DuPont's motion for continuance of the trial date and for limited stay of discovery pending the Hawai'i Supreme Court's ruling and invited DuPont to refile its motions for judgment on the pleadings and for summary judgment. DuPont refiled its motions. On September 4, 2002, prior to the Hawai'i Supreme Court's ruling on the certified questions, the district court granted DuPont's motions for summary judgment as to Plaintiffs' fraud claim on the

grounds that Plaintiffs could not establish reasonable reliance as a matter of law.

After the Hawai'i Supreme Court ruled on the certified questions, Plaintiffs moved to vacate the district court's grant of summary judgment. DuPont filed a counter-motion on July 16, 2003, asking the district court to re-affirm its earlier ruling.

On February 25, 2004, the district court heard these motions and other motions filed by DuPont, which included: (1) a motion for summary judgment on the speculative nature of Plaintiffs' alleged damages; (2) a motion for summary judgment on Plaintiffs' "Alta fraud" claims; (3) a motion for summary judgment on Plaintiffs' "non-fraud" claims; (4) a motion for judgment on the pleadings as to Plaintiffs' RICO claims; and (5) a motion for judgment on the pleadings on Hawai'i's litigation privilege. The district court granted DuPont's motions for summary judgment and for judgment on the pleadings. *Matsuura III*, 330 F. Supp. 2d at 1101. The district court instructed DuPont to draft a proposed order, which the district court adopted almost verbatim and then published. Plaintiffs timely appealed.

## II

We review a dismissal on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) de novo. *Turner v. Cook*, 362 F.3d 1219, 1225 (9th Cir. 2004). Judgment on the pleadings is proper when, taking all the allegations in the pleadings as true and construed in the light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law. *See id.* We review a district court's grant of summary judgment de novo. *Yakutat, Inc. v. Gutierrez*, 407 F.3d 1054, 1066 (9th Cir. 2005). "We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant sub-

stantive law." *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005). We review the district court's exclusion of evidence in a summary judgment motion for an abuse of discretion. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

## III

The district court erred in granting judgment on the pleadings as to the Plaintiffs' RICO claims.

## A

**[1]** The district court erred in granting judgment on the pleadings as to the RICO claims asserted by Fuku-Bonsai and Matsuura. The elements of a civil RICO claim are as follows: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's 'business or property.' " *Grimmet v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996) (citing 18 U.S.C. §§ 1964(c), 1962(c)).

### 1

**[2]** The district court held that Fuku-Bonsai and Matsuura had failed to allege a distinct enterprise. *Matsuura III*, 330 F. Supp. 2d at 1129-31. 18 U.S.C. § 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

"[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and

(2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001); *see also Rae v. Union Bank*, 725 F.2d 478, 481 (9th Cir. 1984). The term "enterprise" is defined in 18 U.S.C. § 1961(4) as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

[3] Perhaps taking a page out of a John Grisham novel,[6] Fuku-Bonsai and Matsuura have alleged that the "person" was DuPont and the "enterprise" consisted of DuPont, the law firms employed by DuPont, and expert witnesses retained by the law firms. To be sure, if the "enterprise" consisted only of DuPont and its employees, the pleading would fail for lack of distinctiveness. *See Cedric Kushner*, 533 U.S. at 164. However, there is no question that law firms retained by DuPont are distinctive entities. *See United States v. Blinder*, 10 F.3d 1468, 1473-74 (9th Cir. 1993). And there is no question that DuPont and the law firms together can constitute an "associated in fact" RICO enterprise. *Id.* at 1473 ((Holding that "a group or union consisting solely of corporations or other legal entities can constitute an 'association in fact' enterprise").

[4] The more difficult question is whether the enterprise formed by the group of DuPont, the law firms it employed, and the expert witnesses that the law firms retained is separate and distinct from DuPont, the RICO "person" alleged in Plaintiffs' complaint. We conclude that they are. The associated in fact enterprise formed by this union is "a being different from, not the same as or part of, the person whose behavior [RICO] was designed to prohibit." *Rae*, 725 F.2d at 481. This is not a situation where the enterprise cannot be either formally or practically separable from the person. *See*

---

[6]In his novel *The Firm*, author John Grisham describes a law firm owned by an organized crime family. JOHN GRISHAM, THE FIRM (Doubleday 1991).

*United States v. Benny*, 786 F.2d 1410, 1416 (9th Cir. 1986). DuPont — a company that offers products and services for markets including agriculture, nutrition, electronics, communications, safety and protection, home and construction, transportation, and apparel — retained law firms for the purpose of defending DuPont in Plaintiffs' lawsuits. These law firms are required to conform to ethical rules and thus are not merely at the beck and call of their clients. As we recently observed:

> Membership in the bar is a privilege burdened with conditions. An attorney is received into that ancient fellowship for something more than private gain. He becomes an officer of the court, and, like the court itself, an instrument or agency to advance the ends of justice.

*Gadda v. Ashcroft*, 377 F.3d 934, 942-43 (9th Cir. 2004) (citations and quotations omitted).

[5] Just as a corporate officer can be a person distinct from the corporate enterprise, DuPont is separate from its legal defense team. *See Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1534 (9th Cir. 1992); *Benny*, 786 F.2d at 1415-16. Indeed, the rules of professional conduct require law firms to be distinct entities and to maintain their professional independence. Model Rules of Prof'l Conduct R. 5.4. In addition, even in the context of the attorney-client relationship, attorneys retain control over important functions; for example, in litigation, the attorney retains control over tactical and strategic decisions. *New York v. Hill*, 528 U.S. 110, 114-15 (2000); Model Rules of Prof'l Conduct R. 1.2 cmt. 1. Thus, the litigation "enterprise" necessarily must be distinct from the client retaining legal assistance. In sum, given the allegations of the complaint, the district court erred in concluding that Plaintiffs failed to allege a distinct RICO enterprise.

2

The district court also concluded that the predicate acts alleged by Plaintiffs did not support a RICO claim because (a) the mail and wire fraud predicate acts failed due to Plaintiffs' inability to establish reasonable reliance; and (b) the obstruction of justice predicate acts failed to meet the RICO requirements of direct injury and continuity.[7] *Matsuura III*, 330 F. Supp. 2d at 1128-29.

**[6]** The district court concluded, without analysis, that Plaintiffs were required to prove that they reasonably relied on DuPont's fraudulent misrepresentations to state a meritorious civil RICO case predicated on mail and wire fraud. *Id.* at 1128-29. Under 18 U.S.C. § 1964(c), civil RICO plaintiffs must demonstrate causation, specifically that they were injured "by reason of" the alleged racketeering activity of the defendant. 18 U.S.C. § 1964(c). "It is well settled that, to maintain a civil RICO claim predicated on mail [or wire] fraud, a plaintiff must show that the defendants' alleged misconduct proximately caused the injury." *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 664 (9th Cir. 2004) (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)). Although, in some cases, "reliance may be a milepost on the road to causation," *id.* (quoting *Blackie v. Barrack*, 524 F.2d 891, 906 n.22 (9th Cir. 1975))., we have in the past declined to announce a black-letter rule that reliance is the only way plaintiffs can establish causation in a civil RICO claim predicated on mail or wire fraud. *Id.* at 666. We need not address

---

[7]We hold that the district court did not err in concluding that Plaintiffs failed to allege a direct relationship between the injury and the alleged wrongdoing. Plaintiffs alleged that the predicate act consisted of DuPont's obstruction of justice in the *Bush Ranch* case. "[P]laintiff[s] who complain[ ] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts [are] generally said to stand at too remote a distance to recover." *Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*, 185 F.3d 957, 963 (9th Cir. 1999) (quoting *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268-69 (1992)).

whether this is a case where Plaintiffs can establish causation only by demonstrating that they reasonably relied on DuPont's fraud,[8] because Plaintiffs adequately pleaded reasonable reliance in their amended complaint. Plaintiffs alleged in their complaint that they "reasonably relied on [DuPont] to obey statutes, court orders, court rules, rules of evidence, written agreements, representations to the court by officers of the court, and representations made under oath to the court by [DuPont]'s officers and agents." First Am. Compl. ¶ 165. Regardless of whether Plaintiffs were required to plead reasonable reliance to satisfy the causation element of their RICO claims, they did, and thus the district court erred in granting judgment on the pleadings on this question.

Although the district court styled its order as one granting judgment on the pleadings, it appeared to be considering this issue on the record. *Matsuura III*, 330 F. Supp. 2d at 1128-29 ("As discussed above, Plaintiffs cannot prove that they reasonably relied on DuPont's alleged fraud."). Therefore, we assume that the district court converted the Rule 12(c) motion into a motion for summary judgment.[9] If so, then the district court erred, because there were genuine issues of material fact that precluded the grant of summary judgment on this question. The district court held that the Plaintiffs' attorney, Malone, knew or had knowledge of many of the alleged facts indicating fraudulent conduct. However, this is a disputed issue. Plaintiffs tendered evidence that Malone did not know

---

[8]Indeed, it would be premature for us to do so, as the Supreme Court recently granted a petition for a writ of certiorari to address the following question: "Did the Court of Appeal for the Second Circuit err when it held that civil RICO plaintiffs alleging mail and wire fraud as predicate acts must establish 'reasonable reliance' under 18 U.S.C. § 1964(c)?" *Bank of China, New York Branch v. NBM L.L.C.*, 125 S. Ct. 2956 (2005).

[9]If the district court considers matters outside the pleadings, the district court treats the Rule 12(c) motion as one for summary judgment and must give all parties a "reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed. R. Civ. P. 12(c). Plaintiffs do not dispute that they received such an opportunity.

the substance of the evidence that DuPont was withholding at the time of settlement. Therefore, there exists a triable factual issue as to reasonable reliance.

In sum, the district court improperly granted judgment on the pleadings on the question of reasonable reliance and, to the extent that the district court converted the Rule 12(c) motion into a Rule 56 motion for summary judgment, it also erred because there were genuine issues of material fact on the question.

3

The district court determined that Plaintiffs did not assert that they had suffered an injury to their business or property, as required under 18 U.S.C. § 1964(c). *Matsuura III*, 330 F. Supp. 2d at 1131. Rather, the district court determined that because Plaintiffs' injury consisted of "a tainted litigation process that diminished their settlements," Plaintiffs suffered "the type of personal injury or injury to an intangible interest not remediable by RICO's civil provisions." *Id.*; *see also id.* at 1132 (holding that Plaintiffs' allegations "fail to allege a cognizable RICO injury and therefore fail as a matter of law"). Plaintiffs argue that they:

> settled product liability claims, accepted deflated settlements, and dismissed those causes of action, only to find out later that they had been defrauded. [Plaintiffs'] underlying claims were specifically focused on injury to their nursery businesses and their property (including damaged plant inventory) caused by defective Benlate, and DuPont's fraud and racketeering activities further damages those business and property interests when they were duped into accepting low settlements.

Brief for Appellants at 75.

**[7]** This court "typically look[s] to state law to determine 'whether a particular interest amounts to property.' " *Diaz v. Gates*, 420 F.3d 897, 899 (9th Cir. 2005) (en banc) (per curiam) (quoting *Doe v. Roe*, 958 F.2d 763, 768 (7th Cir. 1992)). "Without harm to a specific business or property interest—a categorical inquiry typically determined by reference to state law—there is no injury to business or property within the meaning of RICO." *Id.* at *3. Financial losses, in and of themselves, are insufficient to confer standing under RICO. *Id.* at *3 n.1.

**[8]** Plaintiffs allege that they suffered both a harm to a specific property interest and a financial loss. The harm Plaintiffs allege is fraudulent inducement, which is actionable under Hawai'i law. *Matsuura II*, 73 P.3d at 700-01. The financial loss Plaintiffs claim is that they settled their claims for a smaller percentage of their alleged damages than they could have received absent DuPont's fraudulent inducement. *See Matsuura III*, 330 F. Supp. 2d at 1131. Therefore, the district court erred in determining that Plaintiffs' "allegations . . . fail to allege a cognizable RICO injury and therefore fail as a matter of law," *Matsuura III*, 330 F. Supp. 2d at 1132.

4

The district court determined that Plaintiffs' RICO claims fail as a matter of law because they are based on immune litigation conduct. *Matsuura III*, 330 F. Supp. 2d at 1133. The district court reasoned that (1) Plaintiffs' "RICO claims are based on DuPont's conduct in Benlate litigation;" (2) "federal litigation immunity . . . bars subsequent civil litigation based on a party's litigation conduct;" and (3) "there is no stated or clear Congressional intent to abrogate litigation immunity." *Id.* at 1132-33.

**[9]** Common law immunizes *witnesses* in judicial proceedings from subsequent litigation based on their testimony. *See Briscoe v. LaHue*, 460 U.S. 325, 330-31 (1983); *Franklin v.*

*Terr*, 201 F.3d 1098, 1101 (9th Cir. 2000); *Holt v. Castaneda*, 832 F.2d 123, 124 (9th Cir. 1987). Plaintiffs allege that DuPont's RICO liability is predicated on its falsification, destruction, and misrepresentation of evidence. DuPont has not cited any federal case which holds that a party's litigation conduct in a prior case is entitled to absolute immunity and cannot form the basis of a subsequent federal civil RICO claim. *See Florida Evergreen Foliage v. E.I. DuPont de Nemours & Co.*, 336 F. Supp. 2d 1239, 1267 (S.D. Fla. 2004).[10] In fact, the RICO statute, itself, provides that conduct relating to prior litigation may constitute racketeering activity. 18 U.S.C. § 1961(1)(B) (defining racketeering activity as including an act indictable under 18 U.S.C. § 1512, which relates to tampering with a witness, victim, or informant). Therefore, the district court erroneously determined that Plaintiffs' "RICO claims, which are based on immune litigation conduct, fail as a matter of law." *Matsuura III*, 330 F. Supp. 2d at 1133.

B

The district court erred in holding that the statute of limitations precluded relief as to Plaintiffs Living Designs, McConnell, Inc., and Anthurium Acres. Living Designs, McConnell, Inc., and Anthurium Acres did not file their complaints assert-

---

[10]The two cases cited by DuPont — *United States v. Pendergraft*, 297 F.3d 1198 (11th Cir. 2002), and *Raney v. Allstate Ins. Co.*, 370 F.3d 1086 (11th Cir. 2004) — are inapposite, as they deal with whether certain conduct is wrongful within the meaning of the Hobbs Act, 18 U.S.C. § 1951, which criminalizes interfering with commerce through the use of threats or violence. In *Pendergraft*, the Eleventh Circuit held that defendants' "threat to file litigation against Marion County, even if made in bad faith and supported by false affidavits, was not 'wrongful' within the meaning of the Hobbs Act." 297 F.3d at 1208. In *Raney*, the Eleventh Circuit, relying on *Pendergraft*, affirmed the dismissal of plaintiff's RICO claim because conspiracy to extort money through the filing of malicious lawsuits is not wrongful within the meaning of the Hobbs Act, 18 U.S.C. § 1951, and therefore plaintiff failed to allege a predicate act cognizable under RICO. 370 F.3d at 1088.

ing their RICO claims until, respectively, September 24, 1999, May 5, 2000, and September 21, 2000. The district court determined that Plaintiffs had constructive notice of DuPont's fraud no later than August 21, 1995, the date that DuPont was sanctioned for fraud by Judge Elliott in the *Bush Ranch* case. *Living Designs, Inc. v. E.I. du Pont de Nemours & Co.*, No. 99-00660 MLR/LER (D. Haw. Sep. 5, 2002) (order granting DuPont's motion for summary judgment as to plaintiffs' RICO claims based on the statute of limitations). Therefore, the district court concluded that Plaintiffs' RICO claims were barred by the four year statute of limitations. *Id.*

**[10]** The limitations period for civil RICO actions begins to run when a plaintiff knows or should know of the injury which is the basis for the action. *Id.* at 1109. Thus, Plaintiffs' RICO claims accrued when Plaintiffs had actual or constructive knowledge of DuPont's fraud. "Ordinarily, [this court] leave[s] the question of whether a plaintiff knew or should have become aware of a fraud to the jury." *Beneficial Standard Life Ins. Co. v. Madariaga*, 851 F.2d 271, 275 (9th Cir. 1988). "The plaintiff is deemed to have had constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the fraud." *Pincay*, 238 F.3d at 1110 (quoting *Beneficial Standard Life*, 851 F.2d at 275) (internal quotation marks omitted).

**[11]** Plaintiffs have tendered sufficient evidence to raise a genuine issue of material fact as to when they knew of or should have discovered the fraud. The district court relied solely on the entry of Judge Elliot's sanction order. However, the district court erred in determining that, as a matter of law, the attention received by Judge Elliott's ruling could be imputed to the Plaintiffs. *O'Connor v. Boeing North American, Inc.*, 311 F.3d 1139, 1152-53 (9th Cir. 2002) ("The district court erred in concluding as a matter of law that newspaper reports concerning the Defendants' facilities were sufficiently 'numerous and notorious' to impute knowledge of

them to Plaintiffs. The district court held that a 'reasonable, prudent subscriber' of newspapers in the area, and a 'reasonably diligent person living in the area for a substantial period of time between' 1989 and 1991 would have become aware of the release of contaminants from SSFL. This evaluation of the awareness in Plaintiffs' various communities of a specific fact or event was uniquely an issue for the jury to resolve."). Further, Plaintiffs tendered evidence that their attorney did not realize the import of the order until much later. This, along with other evidence in the record, is sufficient to create a triable factual issue as to whether these parties should have known about the alleged fraud when Judge Elliot's sanction order was issued.

## C

**[12]** For these reasons, the district court erred in granting judgment on the pleadings as to the RICO claims. We express no opinion on the merits of the claims, but simply conclude that DuPont is not entitled to judgment on the pleadings for the reasons given by the district court.

## IV

The district court erred in holding that DuPont was entitled to summary judgment under Hawai‘i law because of Plaintiffs' "inability to prove either the fact or amount of damages with reasonable certainty." *Matsuura III*, 330 F. Supp. 2d at 1125.

**[13]** Under Hawai‘i law, in order to maintain a claim for relief grounded in fraud, "the plaintiff must have suffered substantial actual damage, not nominal or speculative." *Zanakis-Pico v. Cutter Dodge, Inc.*, 47 P.3d 1222, 1233 (Haw. 2002) (quoting Prosser, *Law of Torts* at 648 (3d ed. 1964)) (emphasis omitted). "[P]laintiffs suing in fraud are required to show both that they suffered actual pecuniary loss and that such damages are definite and ascertainable, rather than specula-

tive." *Id.* The aim of compensation is to place the plaintiffs in the same position they would have occupied had they not been defrauded. *Id.* In the context of a breach of contract case, the Hawai'i Supreme Court stated regarding the amount of proof needed to establish the fact and amount of damages:

> [A] distinction is made in the law between the amount of proof required to establish the fact that the injured party has sustained some damage and the measure of proof necessary to enable the jury to determine the amount of damage. *It is now generally held that the uncertainty which prevents a recovery is uncertainty as to the fact of damage and not as to its amount.* However, the rule that uncertainty as to the amount does not necessarily prevent recovery is not to be interpreted as requiring no proof of the amount of damage. *The extent of plaintiff's loss must be shown with reasonable certainty and that excludes any showing or conclusion founded upon mere speculation or guess.*

*Chung v. Kaonohi Ctr. Co.*, 618 P.2d 283, 290-91 (Haw. 1980) (emphasis added), *abrogated on other grounds by Francis v. Lee Enters., Inc.*, 971 P.2d 707 (Haw. 1999) (quoting *Ferreira v. Honolulu Star-Bulletin*, 356 P.2d 651, 656 (Haw. 1969).

Regarding the requirement that the amount of damages be shown with reasonable certainty, the Hawai'i Supreme Court has recognized that "[t]he problem of how to measure damages, and how to establish them in fraud cases, is always a difficult one since the person defrauded has, because of the fraud, not pursued alternative courses of action, and the results of those untaken courses therefore remain speculative." *Leibert v. Finance Factors, Ltd.*, 788 P.2d 833, 837 (Haw. 1990). Thus, the Hawai'i Supreme Court has stated that the evidence necessary to show damages with reasonable certainty depends on the circumstances of each individual case.

*Chung*, 618 P.2d at 291 (rejecting other jurisdictions' *per se* rule that the absence of prior income and expense experience of a new or unestablished business renders the loss of anticipated profits too speculative to be proven with reasonable certainty and holding that "where a plaintiff can show future profits in a new or unestablished business with reasonable certainty, damages for loss of such profits may be awarded"). Where the fact of damage is established, Hawai'i law will not insist upon a higher degree of certainty as to the amount of damages than the nature of the case admits, particularly where the uncertainty was caused by the defendant's own wrongful acts. *Coney v. Lihue Plantation Co.*, 39 Haw. 129, 1951 WL 7080, at * 5 (1951); *see also Chung*, 618 P.2d at 291. Thus, the Hawai'i Supreme Court has stated that "[d]amages which cannot be accurately measured should not for that reason be denied, but the amount should be left to the jury." *Id.* at *4 (quoting *Ah Quai v. Puuki*, 11 Haw. 158 (1897)).

[14] Although the Hawai'i state courts have not articulated what must be proven in order to bring a meritorious settlement fraud claim, the district court, relying on a 1911 New York case, determined that "a 'settlement fraud' plaintiff must prove . . . that the settled claim had merit." *Matsuura III*, 330 F. Supp. 2d at 1123.[11] That plaintiffs must demonstrate that their settled claim had merit is inconsistent with the aim of compensation in fraud cases, which is to restore plaintiffs to the position they would be in absent the fraud and to provide plaintiffs with the benefit of the bargain, *see Leibert*, 788 P.2d at 836-37, particularly as a party's decision to settle is often made as a result of a cost-benefit analysis rather than an assessment of the claim's merits.

In *DiSabatino v. United States Fidelity & Guaranty Co.*,

---

[11]The other case cited by the district court to support this assertion is a 1944 case decided by the Indiana Supreme Court, *Automobile Underwriters, Inc. v. Rich*, 53 N.E.2d 775, 777 (Ind. 1944). *Matsuura III*, 330 F. Supp. 2d at 1123 n.19.

635 F. Supp. 350, 355 (D. Del. 1986),**¹²** the United States District Court for the District of Delaware explained why the court does not require plaintiffs alleging that the settlement of their tort claim was procured by fraud to prove that they had a good cause of action against the tortfeasor at the time of the fraud:

> Whether a good cause of action existed at the time of the settlement was a material fact that the parties already considered in reaching a settlement. Requiring a plaintiff to prove in a court of law the existence of a good cause of action for a tort would be inconsistent with affirmance of a settlement agreement. Evidence of the legal and factual strength of the claim merely goes to the value of the claim that was compromised in determining damages from the fraud.

**[15]** The sound approach is one in which the trier of fact determines "the probable amount of settlement in absence of fraud after considering all known or foreseeable facts and circumstances affecting the value of the claim on the date of settlement . . ." *Id.* at 355; *see also Matsuura I*, 166 F.3d at 1008 n.4 (citing *DiSabatino*, 635 F. Supp. at 354-55 for the assertion that "damages for fraud are conceptually different from damages for the underlying tort claims and are not too speculative to calculate"). To put it another way, the relative strength of the claim in the absence of fraud should be used by the trier of fact to determine the amount of the defrauded party's damages. Whether the defrauded party could have won its case if it proceeded to trial is irrelevant to this calcula-

---

**¹²**We favorably cited *DiSabatino* the first time this case was before us. *Matsuura I*, 166 F.3d at 1008 n.4.

The district court in *DiSabatino* expressed its disapproval of *Automobile Underwriters*, *supra* at n.3, to the extent that it required a plaintiff in an action based on settlement fraud to prove that he or she had a good cause of action against the tortfeasor at the time of settlement.

tion. The critical consideration is the settlement value of the case on the date settlement was reached. Such a determination is not beyond the power of a jury to determine. The use of probability analysis, for example, in calculating settlement values is not uncommon.

[16] Here, the district court erroneously required Plaintiffs to present admissible evidence regarding the merits of their underlying product liability claims. *Matsuura III*, 330 F. Supp. 2d at 1124 ("Plaintiffs had made no effort, however, to prove either the merits of their underlying product liability claims or what those claims would have been worth had their [sic] been no fraud by DuPont."). DuPont is also wrong in suggesting that Plaintiffs were required to provide such evidence.

Therefore, the question becomes whether there is a genuine issue of fact regarding whether Plaintiffs suffered damages as a result of DuPont's fraud. Plaintiffs have tendered evidence that knowledge of the withheld evidence on the date of settlement would have increased the settlement value of the case substantially. They cite comparable settlements of much larger amounts[13] and expert testimony.[14] This evidence is suf-

---

[13]DuPont argues that evidence of these settlements and verdicts is inadmissible under FED. R. EVID. 408. However, DuPont did not raise this issue before the district court and the district court did not rule on the admissibility of this evidence. Therefore, DuPont has waived this argument for the purposes of this appeal. *Doi v. Halekulani Corp.*, 276 F.3d 1131, 1140 (9th Cir. 2002). However, DuPont is not precluded from asserting the argument on remand, and we express no opinion on the merits of the question.

[14]Assuming that the district court concluded that the testimony of J. Anderson Berly, III — a trial attorney retained by Plaintiffs to render expert opinions about the materiality and impact of DuPont's withholding of evidence — was inadmissible under FED. R. EVID. 702, *see Matsuura III*, 330 F. Supp. 2d at 1124, 1124 n.21, such constituted an abuse of discretion.

"Rule 702 allows admission of 'scientific, technical, or other specialized knowledge' by a qualified expert if it will 'assist the trier of fact to

ficient to create a triable issue of fact and is not so speculative that damages are incapable of calculation.

[17] DuPont argues that attorney Malone settled the cases with the belief that he would have won at trial. That Malone believed he could win against DuPont before DuPont's fraud was exposed is not particularly relevant to the issue of how much more Malone could have settled Plaintiffs' cases for if he, at the time of settlement, had the test data that DuPont had fraudulently withheld. Malone also testified that he believed the Plaintiffs received "full value" for their cases. This is certainly relevant evidence, but it does not establish full settlement value as a matter of law. Malone also testified that if the

---

understand the evidence or to determine a fact in issue.' " *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), require the district court to perform its gatekeeping role to determine the admissibility of all forms of expert testimony, even the non-scientific testimony at issue here. *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004). The Supreme Court has emphasized that "[t]he inquiry envisioned by Rule 702 is . . . a flexible one," *Daubert*, 509 U.S. at 594, and must be "tied to the facts of a particular case," *Kumho Tire*, 526 U.S. at 150 (quotation marks omitted). "Concerning the reliability of non-scientific testimony such as [Berly's], the '*Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the *knowledge and experience* of the expert, rather than the methodology or theory behind it.' " *Hangarter*, 373 F.3d at 1017 (quoting *Mukhtar v. California State Univ.,* 299 F.3d 1053, 1169 (9th Cir. 2002)) (emphasis in original).

There is no indication that the district court weighed Berly's knowledge and experience in reaching its decision as to whether the testimony was admissible. The district court applied an incorrect legal analysis in assessing the reliability of Berly's testimony in accordance with Rule 702, and thus abused its discretion in excluding Berly's testimony. For the same reason, we conclude that the district court also abused its discretion in excluding the report of Plaintiffs' expert James F. Ventura. We remand to the district court to allow it to determine whether Ventura's and Berly's expert testimony is admissible in the first instance, applying the correct legal framework. *See Sullivan v. U.S. Dept. of Navy*, 365 F.3d 827, 834 (9th Cir. 2002). We express no opinion as to the merits of that inquiry.

Alta data that DuPont had fraudulently withheld had been revealed to Plaintiffs at the time of settlement, Plaintiffs' cases would have been stronger and their settlement value would have been higher.[15] Indeed, the import of Malone's testimony is the subject of vigorous debate between the parties, and the record can support inferences for each position. It is not our task to weigh the evidence. Rather, at this stage of the proceedings, we are required to view the evidence in the light most favorable to the Plaintiffs. Doing so, we conclude there is a genuine issue of material fact regarding whether Plaintiffs suffered damages as a result of DuPont's fraud. The district court erroneously granted summary judgment for DuPont based on its determination that Plaintiffs failed to prove the fact of damages with reasonable certainty.

V

The district court erred in granting summary judgment on the common law fraud claim on the basis that the Plaintiffs could not establish that the alleged fraud was material or that the Plaintiffs reasonably relied upon DuPont's representations to their detriment.

---

[15]Although some of Malone's testimony concerns how the threat of punitive damages would have affected the settlement value of Plaintiffs' cases, most of Malone's testimony concerns how the evidence withheld by DuPont would have weakened DuPont's defenses, particularly its arguments that no SUs had ever been found in their field testing or analytical chemical testing of Benlate and that Plaintiffs were comparatively negligent, and thus would have increased the settlement value of Plaintiffs' cases. Thus, the district court erroneously characterized Malone's testimony as suggesting only "that DuPont's alleged wrongdoing, if known, would have provided [Malone] with the opportunities to seek punitive sanctions and punitive damages against DuPont" and therefore "would have provided him with enhanced bargaining power in the settlement negotiations." *Matsuura III*, 330 F. Supp. 2d at 1124. Likewise, DuPont's assertion that Plaintiffs seek only the enhanced sanctions value of having discovered the fraud, rather than the honest settlement value in the absence of fraud, is erroneous.

A

"The materiality of undisclosed information . . . cannot be determined in a vacuum." *TSA Int'l Ltd. v. Shimizu Corp.*, 990 P.2d 713, 728 (Haw. 1999) (internal quotation marks omitted). "An omitted fact is material if there is a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable [claimant]." *Id.* (internal quotations omitted). Here, the Plaintiffs have tendered sufficient evidence to create a triable issue of fact on materiality. As we have discussed, Plaintiffs tendered evidence that the settlement value of their cases would have increased substantially had the withheld information been produced on the date of settlement. DuPont argues that the information was available elsewhere, that Plaintiffs' attorney had access to the information, and that the Plaintiffs deliberately chose to settle without obtaining the information, but these defenses are fact questions to be resolved by a jury.

B

Under Hawai'i law, Plaintiffs' reliance on DuPont's misrepresentation must be reasonable. *Matsuura II*, 73 P.3d at 701. "As a general principle . . . the question of whether one has acted reasonably under the circumstances is for the trier of fact to determine." *Id.* (quoting *Richardson v. Sport Shinko*, 880 P.2d 169, 178 (Haw. 1994)). "[W]here reasonable minds might differ as to the reasonableness of plaintiff's conduct, the question is for the jury." *Id.* (quoting *Young v. Price*, 388 P.2d 203, 208 n.10 (Haw 1963)) (internal quotation marks omitted).

The Hawai'i Supreme Court, answering the certified question posed to it by the district court of whether Plaintiffs were unable as a matter of law to establish that their reliance on DuPont's representations was reasonable, stated that "we are persuaded that reasonable minds could differ as to the reason-

ableness of the [Plaintiffs'] reliance on DuPont's representations." *Id.* at 704. Although the record has been developed more fully since the Hawai'i Supreme Court considered this matter, our analysis is the same. Although DuPont has raised serious questions about the reasonableness of the reliance and about whether Plaintiffs actually relied upon DuPont's representations, these are factual questions to be resolved by a jury.

## VI

The district court also erred in granting summary judgment on Plaintiffs' non-fraud common law claims other than the claims of negligence and spoliation.

## A

**[18]** The settlement agreement does not preclude Plaintiffs' non-fraud causes of action. Delaware laws governs the construction and effect of Plaintiffs' settlement contracts with DuPont. *Matsuura I*, 166 F.3d at 1008 n.3. The district court determined that *E.I. DuPont de Nemours & Co. v. Florida Evergreen Foliage*, 744 A.2d 457 (Del. 1999), in which the Delaware Supreme Court determined that the general release in the settlement agreement between DuPont and a similarly situated plaintiff did not bar plaintiff's subsequent action against DuPont for fraud in the inducement of the release, did not control the question of whether Plaintiffs' non-fraud claims were barred by the terms of the settlement agreements between DuPont and Plaintiffs. *Matsuura III*, 330 F. Supp. 2d at 1126-27. The district court reasoned that (1) Plaintiffs' "non-fraud do not satisfy the 'fraud exception' articulated by the Delaware Supreme Court," and (2) the covenants not to sue that are contained in the settlement agreements and which are broader than the general release clauses bar any claims related to the settled claims and therefore Plaintiffs' non-fraud claims. *Id.* at 1126-27.

DuPont's argument that the decisions of this court in *Matsuura I* and the Delaware Supreme Court in *Florida Ever-*

*green* "unambiguously were limited to the scope of the *release clause*, and nowhere mentioned the separate *covenant not to sue* in the parties' settlement agreements" is erroneous. Although the covenant not to sue is not quoted in our decision in *Matsuura I*, DuPont argued that the covenant not to sue barred Matsuura's fraud claims in its brief to the *Matsuura I* court. 1997 WL 33547005 (arguing in its brief that "[t]he Matsuuras further agreed not to commence any action against DuPont 'based upon or in any way related to any causes of action, claims, demands, actions, obligations, damages, or liabilities which are the subject of this Release,'" and that "Plaintiffs agreed not to commence or participate in any action based upon or 'in any way related to' a released claim against DuPont in the future."). We rejected DuPont's argument. Thus, the covenant not to sue does not bar Plaintiffs' non-fraud claims.

In addition, although the Delaware Supreme Court does in some instances refer to a "fraud exception," *Florida Evergreen*, 744 A.2d at 461, the court's reasoning for creating the fraud exception applies to non-fraud claims arising out of fraudulent conduct. As stated by the Delaware Supreme Court:

> There is some merit to the contention that parties entering into a general release are chargeable with notice that any uncertainty with respect to the contours of the dispute which led to the litigation, including that which is provable and that which is not, is resolved through the release. *See Hob Tea Room v. Miller*, Del. Supr., 89 A.2d 851, 856 (1952) (construing the effect of a general release that the Court characterized as "unmistakably lucid"). It is quite another thing, however, to conclude that a person is deemed to have released a claim of which he has no knowledge, when the ignorance of such a claim is attributable to fraudulent conduct by the released party. 66 Am. Jur.2d *Release* § 30 (1973).

> At a minimum, if one party is to be held to release a claim for fraud in the execution of the release itself, the release should include a specific statement of exculpatory language referencing the fraud.

*Florida Evergreen*, 744 A.2d at 460-61. In addition, just as DuPont's fraudulent inducement of settlement "subsists separate from, and necessarily occurred after, any conduct DuPont may have engaged in with respect to its manufacture or distribution of Benlate," *id.* at 462, so do other claims stemming from the same fraudulent conduct. Also similar to a claim for fraudulent inducement, other tort claims stemming from the same fraudulent conduct are not ones that ordinarily would be knowingly released. *Matsuura I*, 166 F.3d at 1011.

**[19]** In sum, it appears probable that, under Delaware law, the settlement contracts do not bar Plaintiffs' non-fraud claims.

### B

**[20]** The district court did not err in dismissing Plaintiffs' negligence claims, stating "[t]here is no basis for allowing derivative litigation over claims that an opponent's prior litigation conduct in another case amounted to negligence." *Matsuura III*, 330 F. Supp. 2d at 1128. In a footnote, Plaintiffs argue only that "Hawai'i common law creates a duty not to make negligent misrepresentations, and a breach of such a duty is actionable." Brief for Appellants at 79 n.47 (citing *Zanakis-Pico v. Cutter Dodge, Inc.*, 47 P.3d 1222, 1234 (Haw. 2002)).

**[21]** Because "litigation conduct is governed by statute, rules of procedure, and ethical rules," *Matsuura III*, 330 F. Supp. 2d at 1127, the statutes and rules themselves, must impose a duty of care on parties or their legislative history must manifest an intent on the part of the legislature to do so. *Lee v. Corregedore*, 925 P.2d 324, 342-43 (Haw. 1996); *Huls-*

*man v. Hemmeter Dev. Corp.*, 647 P.2d 713, 719-20 (Haw. 1982). Plaintiffs have not argued or demonstrated that the procedural rules create a duty of care or that their legislative history manifest an intent to do so. As the district court's judgment lays out, the Federal Rules of Civil Procedure do not create duties on which an opposing party may base a negligence claim. *Matsuura III*, 330 F. Supp. 2d at 1127-28 (citing 28 U.S.C. § 2702(b)). A violation of Hawai'i Rules of Civil Procedure, which appear to be modeled on the Federal Rules of Civil Procedure, *Swink v. Cooper*, 881 P.2d 1277, 1282 (Haw. 1994) (noting that HRCP 26(e) is modeled on FRCP 26(e)), likewise appears not to create a separate cause of action.

C

The district court also erroneously dismissed Plaintiffs' non-fraud claims on the grounds of the litigation privilege. *Matsuura III*, 330 F. Supp. 2d at 1128. In *Matsuura II*, the Hawai'i Supreme Court stated that "Hawai'i courts have applied an absolute litigation privilege in defamation actions for words and writings that are material and pertinent to judicial proceedings." 73 P.3d at 692. The court examined the policy considerations behind the privilege and decided not to expand the protection of the privilege to claims outside of defamation actions, holding that "[u]nder Hawai'i law, a party is not immune from liability for civil damages based upon that party's fraud engaged in during prior litigation proceedings." *Id.* at 700, 706. The court appears to emphasize that many of the policies weighing against the application of the privilege do so only when fraud was committed in the prior proceedings. *Id.* at 693-99. In accordance with the Hawai'i Supreme Court's analysis, so long as a cause of action for fraud is asserted, the litigation privilege does not protect subsequent litigation asserting other causes of action stemming from the fraud allegedly committed in prior proceedings. Thus, we hold that Plaintiffs' non-fraud claims are not barred by the litigation privilege under Hawai'i law.

D

In their opening brief, Plaintiffs do not raise the issue that the district court erroneously dismissed Plaintiffs' spoliation claims, and only briefly assail the district court's ruling in its reply brief. As such, Plaintiffs have waived this claim.

VII

Plaintiffs request that this court exercise its supervisory power under 28 U.S.C. § 2106 to reassign this case to a different district court judge on remand. In the ordinary course,

> Absent allegations of bias, the factors this court considers in deciding whether "unusual circumstances" exist and remand to a different judge is appropriate are: (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*United States v. Atondo-Santos*, 385 F.3d 1199, 1201 (9th Cir. 2004) (quoting *United States v. Working*, 287 F.3d 801, 809 (9th Cir. 2002)). A finding of either the first or second factor supports remanding to a different district court judge. *Id.*

Although we do not question the impartiality of the visiting district judge, there are some unusual factors that indicate to us that a reassignment is advisable to preserve the appearance of justice. The visiting district judge adopted the 64 page proposed summary judgment order tendered by DuPont with only a few minor changes. Those changes consisted of additional language complaining about the volume of material involved.

The judge then directed that the ghost-written order be published. Although adopting findings or an order drafted by the parties is not prohibited, we have criticized district courts that "engaged in the 'regrettable practice' of adopting the findings drafted by the prevailing party wholesale." *Maljack Productions, Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 890 (9th Cir. 1996) (quoting *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1385 n.3 (9th Cir. 1984)).

In addition, the visiting district judge took the highly unusual step of reversing *sub silento* the thoughtful certification order previously entered by the district court. In its lengthy order, the district court analyzed the pending dispositive motions in detail and concluded that case involved novel issues of state law. It therefore certified the questions to the Hawai'i Supreme Court and stayed further proceedings, finding in its order that "[t]he viability of the state causes of action in this case turns on the answers to these questions."

When the case was reassigned to the visiting judge, the judge reversed course. Rather than waiting for the Hawai'i Supreme Court to respond to the questions propounded by the district court, the visiting district judge decided that the litigation should proceed. The visiting district judge then denied motions to stay the proceedings pending the certification response by the Hawai'i Supreme Court, invited DuPont to renew its summary judgment motion, and then acted without waiting for the Hawai'i Supreme Court to issue its decision. After the Hawai'i Supreme Court issued its lengthy opinion responding to the certification request, the visiting district judge declined to take the Hawai'i Supreme Court's opinion into consideration, observing that "I'm not a trial court of the Hawai'i courts of appeal." Transcript of Proceedings Before Manuel L. Real, February 25, 2004 at 24. The district court took this action even though the previous judge had certified to the Hawai'i Supreme Court that the viability of the state causes of actions depended on the Hawai'i Supreme Court's response.

**[21]** Considering these actions in the aggregate, we conclude that the appearance of justice requires reassignment on remand. We are also mindful of the expense involved in utilizing visiting judges. Therefore, we remand this case to the Chief Judge of the District of Hawai'i to determine the assignment of the case on remand.

Given the resolution of this case, we need not reach any of the other questions urged by the parties. We need not, and do not, reach the merits of any of the issues remanded to the district court.

**REVERSED AND REMANDED.**