Francis John DiSABATINO, Jr., and Patricia DiSabatino, his wife, as guardians of the property of Francis Gabriel DiSabatino, and individually, Plaintiffs,

v.

UNITED STATES FIDELITY & GUARANTY CO., a corporation of the State of Maryland, Defendant and Third-Party Plaintiff,

v.

C. Waggaman BERL, Jr.,
Third-Party Defendant.

Civ. A. No. 84–260–JJF.

United States District Court,
D. Delaware.

May 15, 1986.

Sidney Balick, Wilmington, Del., for Francis and Patricia DiSabatino.

Wayne N. Elliott, and Michael P. Kelly, of Prickett, Jones, Elliott, Kristol &

merely argued this position in opposition to Plaintiffs' Motion.

Schnee, Wilmington, Del., for U.S. Fidelity & Guar. Co.

C. Waggaman Berl, Jr., Wilmington, Del., pro se.

## OPINION

FARNAN, District Judge.

The defendant in this action, United States Fidelity & Guaranty Co. ("Fidelity"), a Maryland corporation, has filed a motion pursuant to Fed.R.Civ.P. 12(b)(6) (Docket Item ["D.I."] 35) to dismiss the complaint of the plaintiffs, Francis and Patricia DiSabatino, Jr., who are citizens of Delaware, on the grounds that their complaint fails to state a claim upon which relief can be granted.[1] The present litigation arose from a case settled in state court involving the alleged medical malpractice of the defendants' insured. The plaintiffs claim that Fidelity, through its agent, fraudulently misrepresented the amount of insurance coverage and that absent this misrepresentation a trial or settlement would have resulted in a substantially greater recovery. (D.I. 1, ¶ 10.) The plaintiffs proceed on a theory based on fraud and pray for compensatory and punitive damages. (D.I. 1 at 3.) The defendant, in answer, claims that the plaintiffs' case remains essentially a cause of action based on tort, that punitive damages are inappropriate, and that the plaintiffs' only remedy is to rescind the settlement and proceed upon the underlying negligence cause of action. (D.I. 7, ¶ 12; D.I. 36 at 5–11.)

## BACKGROUND

The plaintiffs instituted their original suit against Drs. Charles L. Miller, David A. Levitsky, Joseph A. Vitale, and the Wilmington Medical Center, Inc., in Delaware Superior Court on July 6, 1977.[2] (D.I. 1, ¶ 4.) In the spring of 1983, C. Waggaman Berl, Jr., counsel for plaintiffs, entered into settlement negotiations with Harry B. Hoffman, agent for Fidelity, which was the

malpractice liability insurer for Drs. Miller and Levitsky. (*Id.* at ¶ 5.)

The plaintiffs claim that in the course of these settlement negotiations Hoffman represented to Berl that Miller and Levitsky each had liability coverage of $200,000, for a total policy limit of $400,000 when Hoffman knew in fact that a $1,000,000 excess malpractice liability policy covered the insureds against the plaintiffs' claim and that his representation was false. (D.I. 1, ¶¶ 6–7.) The plaintiffs further allege that in reliance on this representation they entered into a settlement agreement whose value Hoffman represented to Berl as having a current value of $294,000. The Court of Chancery approved the settlement on July 8, 1983. (*Id.* at ¶ 8.)

The defendant denies that Hoffman made any misrepresentation but admits that he knew that there was excess liability coverage. (D.I. 7, ¶¶ 6–7.)

## ANALYSIS

The defendant has made a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). A court should not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Bernstein v. IDT Corp.*, 582 F.Supp. 1079, 1082 (D.Del.1984). Specifically, the defendant is asking this Court not to recognize a cause of action which is a matter of first impression in the State of Delaware: whether a plaintiff who has settled a negligence suit for personal injuries may affirm that release and institute a cause of action based on fraud.

In this case, the Court is exercising its diversity jurisdiction. Although providing a federal forum, the Court must apply the substantive law of the appropriate state jurisdiction as expressed in that state's statutes and decisions of its highest courts. *Erie Railroad v. Tompkins*, 304 U.S. 64,

---

**1.** Jurisdiction arises under 28 U.S.C. § 1332(a)(1). Venue is laid under 28 U.S.C. § 1391(a).

**2.** Civil Action No. 77C–JL–9 (New Castle County).

78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). In certain instances, the law of a state on a particular issue is not readily accessible because the state's highest court has not yet dealt with that question of law. *Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp.*, 626 F.2d 280, 285 (3d Cir. 1980). "In the absence of an authoritative pronouncement from the state's highest court, the task of a federal tribunal is to predict how that court would rule." *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1167 (3d Cir. 1981); *Jones & Laughlin Steel Corp.*, 626 F.2d at 285.

The Court must examine the best available evidence in forecasting such decisions. Evidence of state law can come in the form of lower state court precedents, related decisions in considered dicta of a state's highest court, the policies that inform that court's application of certain legal doctrines, court decisions in other jurisdictions, and relevant legal treatises and articles. *See McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657, 662–63 (3d Cir.), *cert. denied*, 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980); *Brown v. Caterpillar Tractor Co.*, 696 F.2d 246, 250 (3d Cir. 1982).

As the defendant notes, the Delaware courts are in accord with the basic contract principle that a party defrauded on a contract may elect either to rescind the contract or to affirm it and sue for damages. *Sannini v. Cascells*, 401 A.2d 927, 930 (Del.Supr.1979); *Hegarty v. American Commonwealth Power Co.*, 19 Del.Ch. 86, 163 A. 616, 619 (1932). However, the courts in Delaware have yet to apply this principle in the context of releases of tort claims, which are a species of contract. There is a split of opinion whether a plaintiff has an election of remedies in such a case. Several courts have held that the releasor of a tort claim may stand upon a fraudulently induced release and maintain a separate fraud action. *Slotkin v. Citizens Casualty Co. of New York*, 614 F.2d 301, 312 (2d Cir.1979), *cert. denied*, 449 U.S. 981, 101 S.Ct. 395, 66 L.Ed.2d 243 (1980); *Bilotti v. Accurate Forming*

*Corp.*, 39 N.J. 184, 188 A.2d 24, 34–35 (1963). In other jurisdictions, however, courts have made a distinction between contract and tort claims and have refused to allow a plaintiff to elect rescission or affirmance when the underlying cause of action is an action sounding in tort. *Mackley v. Allstate Ins. Co.*, 564 S.W.2d 634, 635–36 (Mo.App.1978); *Shallenberger v. Motorists Mutual Ins. Co.*, 167 Ohio St. 494, 150 N.E.2d 295, 299 (1958).

This Court predicts that in a case such as this a Delaware court would rule that a tort claimant has an election to stand on a fraudulently induced release and proceed on a cause of action based on fraud. The reasoning of the Delaware Court of Chancery in *Hegarty* provides some support for such a prognostication. *Hegarty* involved an allegedly fraudulent acquisition of stock by the defendant from the plaintiff. The plaintiff was allowed to recover on the basis of the equitable right to a rescission although he did not restore or offer to restore anything obtained under the contract.

The court in *Hegarty* employed expansive language in detailing the remedies available to a party induced to enter an agreement by fraudulent misrepresentation. In such a case, the contract is voidable, and the plaintiff may "let the contract stand, retaining all that he obtained thereunder, and maintain an action at law to recover damages for the fraud." *Hegarty*, 163 A. at 619. The plaintiff alternatively may "choose to regard the contract as never having been entered into and seek relief based on rescission, in which event the relief afforded is by way of restoration of the parties to the status quo ante." *Id.* In discussing this election, the court stated that the "best interests" of the aggrieved party would suggest which election he would make and did not attempt to "elaborate upon the details or shades" of application of these "general principles." *Id.* The court gave no indication that such principles should be restricted exclusively to contracts involving commercial fraud.

More on point is *Eastern States Petroleum Co. v. Universal Oil Products Co.*, 29 Del.Ch. 305, 49 A.2d 612 (1946). In the course of a patent infringement litigation, the parties entered into a compromise agreement the consideration for which included the release of the complainant's rights in an antitrust case against a third party to which the opposing party was liable. The Court of Chancery in *Eastern States Petroleum* considered this release to form part of the consideration for certain licenses and rights received by the complainant in the agreement of settlement. *Id.* 49 A.2d at 615. The court held that in this case the complainant must make an election of remedies because of the fraud alleged by the complainant in the making of settlement. *Id.* 49 A.2d at 616.[3]

*Eastern States Petroleum* demonstrates that in Delaware a settlement agreement involving the release of a cause of action should be treated no differently from a fraudulently induced commercial contract in which courts routinely allow an election of remedies. Such a rule of law is significant, because it is in fundamental contradiction to the reasoning of courts which differentiate between a simple contract and a settlement of a tort claim.

The holdings of *Hegarty* and *Eastern States Petroleum* can easily be extended to cover a contract of settlement compromising a tort claim. A contrary holding fails both on grounds of analytical consistency and for reasons of policy.

The distinction made by some courts between simple contracts and releases of tort actions rests in part on the theory that the tort claimant has parted with nothing because he can avoid the contract of settlement and reinstitute his original cause of action. Unlike tort claims, commercial contracts often involve commodities whose value diminishes with each transaction. Of course, proof of damage is a necessary element in an action based on fraud.[4] An Ohio court in *Shallenberger v. Motorists Mutual Ins. Co.*, 167 Ohio St. 494, 150 N.E.2d 295 (1958), formulated this theory in a convincing and articulate fashion:

There is usually no analogy between the situation of one induced by fraud to release a tort claim and one induced by fraud to buy something. Obviously, in a case like the instant case, the releasor of a tort claim buys nothing, although he may receive something, usually money or its equivalent, for what he relinquishes. He does give up something (*i.e.*, his tort claim), as a seller gives up what he sells. Thus, on cursory consideration, the release of a tort claim might appear to be analogous to a sale of something. However, where there has been a sale of something, possession of that something has usually been relinquished by the seller. Even where use of the sold something has not made it less valuable, the seller will usually want money for it as he did when he made the sale. If he takes it back, he has to sell it to get that money. Each change of possession of that something will ordinarily involve ex-

---

3. In this case, the court was criticizing the plaintiff for attempting to rescind the agreement yet enjoy some of its benefits. A clear election must be made: "In other words, it (the plaintiff) cannot cause the rescission of a contract in part and its approval in part, as self-interest may dictate. *Hegarty v. American Commonwealth Power Corporation....*"; *Eastern States Petroleum*, 49 A.2d at 616. The court continued: "In appropriate cases, it is doubtless true that if a 'just and equitable restoration cannot be made by the parties, then the contract must stand and the petitioner, if aggrieved by fraud, must look for relief to its appropriate remedy for damages.'" *Id.*

4. In an action based on fraud,

(1) The deceiver must make a false representation of a material fact to the victim. (2) The deceiver must have had knowledge of the falsity of his representation, while his victim must have been ignorant thereof. (3) The representation must have been made with the threefold intent that the victim believe it to be true, act in reliance thereon, and be deceived thereby. (4) The victim must have so believed, acted, and been deceived, as well as having been damaged thereby.

*Twin Coach Co. v. Chance Vought Aircraft, Inc.*, 2 Storey 588, 52 Del. 588, 163 A.2d 278, 284 (1960). *See Harman v. Masoneilan Intern., Inc.*, 442 A.2d 487, 499 (Del.Supr.1982); *Lock v. Schreppler*, 426 A.2d 856, 861 (Del.Super.1981).

pense or inconvenience. On the other hand, the releasor has nothing to repossess on rescission of the release; and such rescission revests him with the same claim for money that he had before, not something he must resell to get that money. In reality, the releasor does not sell anything even of an intangible nature. In effect, the releasor has merely agreed for a consideration not to enforce his tort claim.

*Id.* 150 N.E.2d at 300. Other courts have adopted such a rationale in prohibiting affirmance of releases in an action for fraud. *See Taylor v. Federal Kemper Ins. Co.,* 534 F.Supp. 196, 198 (W.D.Ark.1982); *Mackley v. Allstate Ins. Co.,* 564 S.W.2d 634, 636 (Mo.App.1978).

On close examination, the fallacy of this position is evident. A tort claimant may indeed have lost something by deciding not to prosecute an action and instead to accept a monetary consideration in settlement. The court in *Shallenberger* does not attribute any value to opportunities foregone. The lapse of time may well affect the cost of bringing suit. A statute of limitation may have run out. *See Beeck v. Kapalis,* 302 N.W.2d 90, 92 (Ia.1981)(where a plaintiff alleges that a defendant's misrepresentation caused the loss of a valid cause of action, the court will not require him to bring the original action and lose before recognizing a damage claim for misrepresentation). A reinstatement of the action may be barred by *res judicata. See Sade v. Northern Natural Gas Co.,* 483 F.2d 230, 234 (10th Cir.1973)(suit might be barred against defendant's employees if plaintiff is forced to set aside release given to defendant employer).

A settlement agreement is surely a contract, for which consideration on both sides has passed. The consideration given by the plaintiff, the right to prosecute his tort claim—like something which a seller has sold and whose value in use is bound to decline—certainly will change in value with the passage of time. In effect, the plaintiff is a seller of a cause of action of which he must regain possession. "Each change

of possession of that something will ordinarily involve expense or inconvenience." *Shallenberger,* 150 N.E.2d at 300. *See Ware v. State Farm Mut. Auto. Ins. Co.,* 181 Kan. 291, 311 P.2d 316, 320 (1957)(plaintiffs in signing a release give up a valuable right); *Kordis v. Auto Owners Ins. Co.,* 311 Mich. 247, 18 N.W.2d 811, 812 (1945)(plaintiff was deprived through fraud and deceit of a valuable right to be compensated and may therefore sue for fraud). Such a rule is also in harmony with the holding of the Delaware Court of Chancery in *Eastern States Petroleum* discussed above, which recognized an election of remedies when part of the consideration in a settlement is the release of a cause of action.

The second rationale employed by these courts involves an argument concerning damages. The argument is twofold. The assumption is that the damages in the action for fraud are too speculative because they must be measured on the basis of the personal injuries sustained. "[T]he measure of damages, if any, in the action for fraud and deceit is inextricably bound with the question of liability and the nature and extent of the injuries involved in the underlying tort claim which was settled." *Mackley v. Allstate Ins. Co.,* 564 S.W.2d 634, 636 (Mo.App.1978). In addition, the proponents of this argument claim that the damages constitute the award that a tort plaintiff *would have received* in a trial:

The difficulty in determining the amount of damages is insurmountable. If the jury found a fraud had been committed upon the plaintiff to induce her to give up her cause of action, how would it determine what amount, if any, she would have received from another jury, had she not compromised her action, but had proceeded to trial? And how could damages in the instant case be assessed without some measure of what would have been accorded to plaintiff in the original action, had she proceeded to trial.

*Id.* (quoting *Taylor v. Hopper,* 207 Cal. 102, 276 P. 990 (1929)).

Such reasoning simply does not address the interests a plaintiff seeks to vindicate who alleges fraudulent misrepresentation. In any action based on fraud, the fact finder will simply measure the extent of the plaintiff's damages by examining what the agreement would have been, had the parties known the actual material facts. The nature of the injuries in the foregone tort action are relevant only to the extent of how they would affect the value of the claim to be compromised in the context of the actual coverage provided by the defendant insurance carrier. The plaintiff has affirmed its agreement to settle; thus the fact finder need not conjecture what another jury would have awarded in tort damages. The damages remain those arising *ex contractu:*

> The measure of damages under this second method must take into consideration the salable value of the right of action for the purpose of compromising, and the nature and extent of the injuries known and foreseeable as of the time of the settlement, under the particular circumstances of the parties then shown existing.

*Automobile Underwriters, Inc. v. Rich,* 222 Ind. 384, 53 N.E.2d 775, 777 (1944). The plaintiff may keep what he received and file suit against the ones committing the alleged fraud and recover "such an amount as will make the settlement an honest one." *Id.* In other words, the measure of damages is the "loss of the bargain." *See Slotkin · v. Citizens Casualty Co. of New York,* 614 F.2d 301, 313 (2d Cir.1979), *cert. denied,* 449 U.S. 981, 101 S.Ct. 395, 66 L.Ed.2d 243 (1980)(true measure of damages is difference in settlement value before and after discovery of fraud). After the trier of fact has determined the probable amount of settlement in the absence of fraud after considering all known or foreseeable facts and circumstances af-fecting the value of the claim on the date of settlement, the amount in settlement already received should be deducted from this total amount. *Id.* 53 N.E.2d at 779.

In addition, some courts require a plaintiff in an action based on fraud to allege and prove not only that the settlement was procured by fraud but also that he had a good cause of action against the tortfeasor at the time of settlement. *See Automobile Underwriters,* 53 N.E.2d at 777. However, this Court finds that plaintiffs are required only to prove that a contract of settlement existed to which they were fraudulently induced to agree and which resulted in their damage. Whether a good cause of action existed at the time of the settlement was a material fact that the parties already considered in reaching a settlement. Requiring a plaintiff to prove in a court of law the existence of a good cause of action for a tort would be inconsistent with affirmance of a settlement agreement. Evidence of the legal and factual strength of the claim merely goes to the value of the claim that was compromised in determining damages from the fraud. *See* Immel, *The Requirement of Restoration in The Avoidance of Releases of Tort Claims,* 31 Notre Dame Lawyer 629, 676–77 (1956).

Simply as a matter of policy, this cause of action should be deemed to exist. First, insurance companies would have everything to gain and nothing to lose by systematically defrauding tort claimants into accepting low settlement offers. In such cases the company gambles that the deceit will not be uncovered. If the fraud is uncovered, then the company only faces litigation, or the costs of reimbursement, that it would have had to confront without a settlement. In economic terms, some insurance carriers calculate an "opportunity cost"[5] which is artificially low. If, in

---

5. An "opportunity cost" is a concept in economics which measures the cost of engaging in one activity instead of another. As an example, the cost to Robinson Crusoe when he picks strawberries is the sacrificed amount of raspberries he might otherwise have picked with the same

time and effort. P. Samuelson, *Economics* 474–75 (1976). In the present case, the opportunity cost would be merely the cost of defending the tort claim by the plaintiff. In other words, the insurance carrier calculates the cost of engaging in fraud to be only the cost of going to trial on

addition to the expense of a tort litigation, the cost of defending a fraud action were included in the calculation, the opportunity cost of committing the fraud would be a good deal higher. In the language of the law, the defendant should not be unjustly enriched. *See Slotkin v. Citizens Casualty Co. of New York*, 614 F.2d 301, 312 (2d Cir.1979), *cert. denied*, 449 U.S. 981, 101 S.Ct. 395, 66 L.Ed.2d 243 (1980)("New York rule" serves to deter fraud); C. McCormick, Handbook on the Law of Damages § 121 at 453 (1935). Moreover, such a rule would enforce a higher standard of care among insurance agents, thus helping to prevent cases of merely negligent misrepresentation.

Second, the opportunities for overreaching and committing fraud in releases of tort claims may be greater than in typical cases of commercial contract fraud, where the parties are more often on an equal footing. Duress, coercion, and immediate need for liquid assets are ever present for the unfortunate tort claimant. In many cases, plaintiffs have spent much, if not all, of the settlement sum on necessities before discovering the fraud. The plaintiff should be permitted to retain the settlement amount in the ensuing fraud action, and to deduct that amount from the final amount of damages. The difficulty and often impossibility of restoring the status quo ante has served as rationale for retaining the settlement amount even in cases of rescission. *Pattison v. Highway Ins. Underwriters*, 278 S.W.2d 207, 212 (Tex.Civ.App.1955); *Traders & General Ins. Co. v. Towns*, 130 S.W.2d 445, 448 (Tex.Civ.App.1939); Immel, *supra*, at 651–52.

As with any case of fraud, a court may impose punitive damages if the fraud is "gross, oppressive, or aggravated, or where it involves breach of trust or confidence." *Stephenson v. Capano Develop-*

*ment, Inc.*, 462 A.2d 1069, 1076–77 (Del. Supr.1983). *See Nash v. Hoopes*, 332 A.2d 411, 414 (Del.Super.1975); *Guthridge v. Pen-Mod, Inc.*, 239 A.2d 709, 715 (Del.Super.1967). In this case the plaintiffs allege fraudulent misrepresentation. Whether an award of punitive damages is appropriate is a factual question and must be determined on a case-by-case basis.

Because the Court holds that a party defrauded on an agreement to settle a tort claim may elect in Delaware either to rescind the contract or to affirm it and sue for damages resulting from the fraudulent misrepresentation, the Court need only briefly address the defendant's contention that the plaintiffs may not sue them directly but must sue the insureds. (D.I. 36 at 12–13.) Quite simply, the plaintiffs are seeking relief against Fidelity for the alleged fraud that it carried out directly against them. The alleged tortfeasor has no role to play in the present litigation.

The rationale of the Court's holding also disposes of the defendant's argument that "the determination as to whether or not the release was fraudulently obtained should be decided in a trial separate from the underlying tort action" because of the prejudice resulting from the "injection of insurance into the underlying tort action." (D.I. 36 at 14.) Again, the only cause of action which the plaintiffs frame in their complaint is one sounding in fraud allegedly committed by the defendant insurance company. Indeed, insurance coverage—both the amount which Fidelity allegedly misrepresented to the plaintiffs and the actual limit of coverage of $1,000,000—has the utmost material relevance in determining the liability and amount of compensatory and punitive damages, if any, in this case. The cases cited by the defendant are completely inapposite, as they involve an underlying tort action, which the plaintiffs in this case have elected to forego. The al-

this claim, based on the probable amount of damages to the plaintiff and likelihood of the plaintiff's victory. Under common law jurisdictions which allow only rescission, the opportunity cost would not even include the settlement amount, since the plaintiff in rescinding the

compromise must return this amount. This is the procedure required in Delaware when a plaintiff elects rescission. *See Eastern States Petroleum*, 49 A.2d at 616; *Hegarty*, 163 A. at 619.

leged tort is relevant only to the extent of determining the plaintiffs' damages from the fraud because the tort concerns the value of the right of action which the plaintiffs compromised.

Judgment will be entered in accordance with this opinion.