69 Cal.Rptr.3d 551 (2007)
157 Cal.App.4th 1416
VILLAGE NORTHRIDGE HOMEOWNERS ASSOCIATION, Plaintiff and Appellant,
v.
STATE FARM FIRE AND CASUALTY COMPANY, Defendant and Respondent.
No. B188718.
Court of Appeal of California, Second District, Division Eight.
December 17, 2007.
*552 Engstrom, Lipscomb & Lack, Jerry A. Ramsey, Brian J. Heffernan and Alexandra J. Thompson, Los Angeles, for Plaintiff and Appellant.
Robie & Matthai, James R. Robie, Kyle Kveton and Steven S. Fleischman, Los Angeles; LHB Pacific Law Partners and Clarke B. Holland, Emeryville; and Crandall, Wade & Lowe and Michael J. McGuire, Irvine, for Defendant and Respondent.
RUBIN, J.

SUMMARY
An insurer and its insured, a homeowners association, settled disputed claims arising from the Northridge earthquake, with the insurer paying $1.5 million and the insured releasing the insurer from all claims or causes of action it had or.may have arising out of its earthquake claim. Two years later, the association sued the insurer, and still later discovered the limits of its insurance policy were almost $7 million greater than had been represented by the insurer. The insurer insists that the association cannot pursue its claim unless it rescinds the settlement agreement and returns the $1.5 million, relying on Supreme Court precedents holding that a plaintiff cannot avoid a fraudulently induced contract of release without rescinding the contract and restoring the money paid as a consideration for the release. (Garcia v. California Truck Co. (1920) 183 Cal. 767, 773, 192 P. 708 (Garcia).) The association, which long ago used the $1.5 million to repair earthquake damage, insists it has the option of affirming the settlement agreement and recovering damages for the fraud. (See Bagdasarian v. Gragnon (1948) 31 Cal.2d 744, 750, 192 P.2d 935.)
We agree with the association, concluding that the Supreme Court precedents on which the insurer relies apply only to the release of personal injury claims, and not to the settlement and release of claims arising from a contract of insurance. Accordingly, the trial court erred when it sustained the insurer's demurrer on the ground the association could not "have it both ways" by keeping the settlement monies but not releasing the claims.

FACTUAL AND PROCEDURAL BACKGROUND
This is the second time this case has come to the Court of Appeal.
The lawsuit arose from the Northridge earthquake in January 1994, and was filed in December 2001, after the Legislature revived insurance claims otherwise barred by the statute of limitations. Village Northridge Homeowners Association (the Association or the insured) sued State Farm Fire and Casualty Company (State Farm or the insurer), alleging breach of contract and breach of the implied covenant of good faith and fair dealing. The complaint alleged State Farm improperly undervalued the Association's loss, inducing it to forego proper repairs and to forego payment of amounts properly owed under the policy. The Association further alleged it "was required to sign a release and did so under compulsion and with no other option afforded to secure partial benefits owed," and that it did not agree "that the partial payments provided fully compensated [the Association] for the actual damages and loss sustained. . . ."

1. Previous trial court proceedings and appeal.
State Farm filed a motion for summary judgment, contending the release the Association executed barred its lawsuit. State Farm's declarations asserted, among *553 other things, that the policy limits for earthquake damage were $4,974,900, with a deductible of ten percent, but it submitted no documentary confirmation of the policy limits. State Farm made various payments, totaling approximately $2,068,000, and in 1998 the Association sought additional policy benefits. State Farm reinspected the property and determined that a portion of the claimed additional damage might be earthquake related and that a portion was not. In November 1999, the parties negotiated a compromise of the claim, agreeing to payment by State Farm of $1.5 million. The Association unconditionally released State Farm from all claims, known or unknown, in any way related to the Association's earthquake claim. In late 2000, the Association contacted State Farm to reopen the claim, and State Farm declined to do so.
In its opposition to State Farm's summary judgment motion, the Association asserted that the insurance contract provided a limit of $11,905,500 with a 10 percent deductible, and that State Farm misrepresented its policy limits to the Association in the course of adjusting the claim and inducing the execution of the release. A declaration from an Association board member who signed the release stated that State Farm's offer "was made in conjunction with overt representations, written and oral, that the policy limits were $4,974,900.... At the time, we had no idea that this representation regarding policy limits was untrue and we executed the subject Release under the mistaken belief that State Farm had honestly and accurately represented its policy limits to us." State Farm's $1.5 million offer was made on a "take it or leave it" basis, and "was not the product of any `negotiation.'" The association "was upside down financially" and "simply had no choice but to do whatever State Farm insisted in order to at least secure a portion of the policy benefits that were owed and to partially fund the massive earthquake repairs that were presented." Homeowners were individually assessed thousands of dollars to partially fund repairs but "millions of dollars of further repairs remain to be performed at this time." With the declaration, the Association submitted a copy of the policy declarations that was "recently retrieved from storage from our property manager...." It showed policy limits of $11,905,500 for buildings, an earthquake endorsement and 10 percent earthquake deductible, and no indication of any different policy limits for earthquake coverage.
The trial court granted summary judgment for State Farm, ruling the Association had not demonstrated the release agreement was a product of undue influence or fraud, and that it was binding on the parties.
This court reversed the judgment, concluding material issues of disputed fact existed concerning the limits of the earthquake policy and whether the policy limits were misrepresented by the insurer during the adjustment process. (Village Northridge Homeowners Association v. State Farm Fire & Casualty Co. (Mar. 14, 2005, B172913) [nonpub. opn.].) Because a resolution of these issues was necessary to a determination whether the insured's release was valid and enforceable, we held summary judgment was improper.

2. Current trial court proceedings.
When the case was returned to the trial court, State Farm filed a motion for judgment on the pleadings. State Farm asserted the complaint did not state a claim upon which relief could be granted, because the Association's claims were barred by the settlement agreement and release, and the Association could not rescind the settlement agreement without first offering *554 to restore to State Farm the consideration it paid under the agreement. The trial court granted the motion, with leave to amend, observing that the complaint did not allege fraud in the inducement or rescission, and that the Association "need[s] to either rescind the agreement or affirm the agreement and sue for damages."
The Association then filed a first amended complaint, alleging a cause of action for fraud in addition to its original claims for breach of contract and breach of the implied covenant of good faith and fair dealing. The Association alleged it had spent the $1.5 million on partial earthquake repairs and was not offering to return the $1.5 million; acknowledged a credit in that amount in State Farm's favor against the damages sought in the lawsuit; did not seek to rescind the release; and "`affirm[ed]' the Release, as requested by the Court, and [sought] damages ...," contending the release was unenforceable as the product of fraud.
State Farm demurred, asserting, inter alia, that the Association could not affirm the settlement agreement and simultaneously assert claims that were explicitly released in it. The trial court sustained the demurrer with leave to amend, stating that the Association must either rescind the settlement agreement and release or affirm the settlement agreement and release, and that "[h]ere, the release was the purpose of the settlement agreement and they are all part of the same agreement...," citing Garcia, supra, 183 Cal. 767, 192 P. 708.
The Association filed a second amended complaint, which was not significantly different from the first, alleging the $1.5 million was a grossly deficient, partial payment toward an $8 million loss; the $1.5 million was owed under the insurance policy independent of the release; and the court had the inherent power to set aside a release procured by fraud. State Farm again demurred. The trial court sustained the demurrer without leave to amend, observing the Association chose to affirm the settlement agreement and keep the money paid by State Farm, but not to release the claims, and "[t]hey can't have it both ways."
Judgment was entered and the Association filed this timely appeal.

DISCUSSION
State Farm contends the Association's only option under California law for avoiding its release was to rescind the settlement agreement and return the $1.5 million to State Farm, and it cannot "keep the money and sue." While the question is not without difficulty, we conclude that, in the circumstances of this case, State Farm is mistaken.
In Garcia, supra, 183 Cal. 767, 192 P. 708, the Supreme Court made it clear that rescission is essential to the extinguishment of a contract of release in a personal injury case, and that there can be no rescission without restoration of the consideration. This is not, however, a personal injury case, in which the only purpose of the releasee's payment is to obtain a release from an inchoate tort claim. This is an insurance contract case, in which the releasee-insurer had an underlying contractual obligation to pay for damage to the insured's dwellings caused by earthquake, and in addition a statutory obligation not to misrepresent the terms of its policy.[1] (See Ins.Code, § 790.03.) Under these circumstancesand particularly *555 where the consideration received by the releasor was long ago expended to repair the very damage the releasee-insurer contracted to coverwe conclude Garcia does not prevent the insured from avoiding the release without returning the consideration for which it was given.
We briefly describe the legal principles and precedents that inform our conclusion. Two general principles are relevant. The first is the Garcia principle: that a plaintiff in a personal injury case cannot avoid a fraudulently induced contract of release without rescinding the contract and restoring the money paid as a consideration for the release. (Garcia, supra, 183 Cal. at p. 773, 192 P. 708.) The second is the more general principle that, if a defrauded party is induced by false representations to execute a contract, the party has the option of (1) rescinding the contract and restoring any consideration received under it, or (2) affirming the contract and recovering damages for the fraud. (Bagdasarian v. Gragnon, supra, 31 Cal.2d at p. 750, 192 P.2d 935; Hines v. Brode (1914) 168 Cal. 507, 511-512, 143 P. 729.) We conclude the second, more general, principle applies here, permitting the Association to affirm the settlement agreement and recover damages for the fraud.
Initially, we note our recognition of the apparent incongruity, noted by the trial court, in "affirming" a contract and yet avoiding one of its principal terms: the release. The incongruity, however, is not as severe as may first appear. Indeed, because of the underlying insurance obligation, the circumstance is not unlike both (1) cases in which a settlement agreement and the mutual releases in it are considered separable, thus permitting the plaintiff to affirm the settlement and sue for fraud despite the release (Persson v. Smart Inventions, Inc. (2005) 125 Cal. App.4th 1141, 1154, 23 Cal.Rptr.3d 335), or (2) cases, as described in Garcia, applying the "well-recognized rule" that one who rescinds a contract for fraud "is not required to restore that which in any event he would be entitled to retain." (Garcia, supra, 183 Cal. at p. 771, 192 P. 708.) While neither principle fits perfectly, either is more appropriately applied to a case in which an insurer has misrepresented policy limits to obtain a settlement than is a principle that requires the return of the insurance settlement monies as the price of a challenge to the insurer's fraud. We turn to a review of the cases and State Farm's contentions.

1. Garcia and Taylor are not controlling.
State Farm argues that Garcia and a similar case, Taylor v. Hopper (1929) 207 Cal. 102, 276 P. 990 (Taylor), control. In Taylor, the Supreme Court held that the remedy of affirming a compromise agreement, retaining the money received under it, and suing for fraud "does not exist in a case such as we are considering." (Taylor, supra, 207 Cal. at p. 103, 276 P. 990.) But Taylor, like Garcia, was considering a personal injury case, in which plaintiff was run over by defendants' automobile and released her claim in a compromise agreement. Taylor concluded the "affirm and sue" remedy did not exist because "[t]he difficulty in determining the amount of damages is insurmountable." (Ibid.) The court explained:
"If the jury found a fraud had been committed upon plaintiff to induce her to give up her cause of action, how would it determine what amount, if any, she would have received from another jury had she not compromised her action, but had proceeded to trial? And how could damages in the instant case be assessed without some measure of what would have been accorded to plaintiff in the *556 original action had she proceeded to trial? ... `In case the right of action had no value, she had gained by the transaction and was not injured. It had no value whatever if the true state of facts disclosed that it was an invalid and nonexisting claim, or, in other words, that the defendant was not negligent.... An alleged value of the claim based upon ... facts sufficient to warrant the reasonable belief of the plaintiff that she had a just claim is of a nature too speculative and wagering to be recognized by the law in this action for fraud.'" (Taylor, supra, 207 Cal. at pp. 103-104, 276 P. 990, italics omitted, quoting Urtz v. New York Central etc. Co. (1911) 202 N.Y. 170, 175-176, 95 N.E. 711.)
The court concluded the compromise "was of a disputed claim, unliquidated in amount and there is no practicable measure of damages for the action sought to be maintained." (Taylor, supra, 207 Cal. at p. 105, 276 P. 990.)
State Farm insists Garcia and Taylor are not "archaic decisions," and that their holdings "comport with common sense and the strong policy in favor of settlement." While we do not disagree with these sentiments, we cannot agree that the Garcia/Taylor principle applies to the settlement of a claim grounded upon an insurance contract. Indeed, Taylor itself demonstrates that a personal injury settlement is very different from an insurance settlement. The principal difference, of course, is the existence of an underlying liability. In Taylor or any other personal injury claim, there may or may not be a valid negligence claim and underlying liability on the part of the defendant. (Taylor, supra,207 Cal. at p. 104, 276 P. 990 ["`[the claim] had no value whatever if the true state of facts disclosed that it was an invalid and non-existing claim, or, in other words, that the defendant was not negligent'"].) In an insurance settlement, by contrast, there is necessarily an underlying liability on the part of the insurer. While the scope of the insurer's liability may be subject to dispute, the existence of its contractual obligation to pay for earthquake repairs is not. In other words, there is no question that State Farm actually owed the Association some amount of money for earthquake damage,[2] and was willing to pay $1.5 million to settle that obligation. This is far different from the tort claim context, in which liability for payment of the claim may or may not exist.

2. Other precedents confirm the distinction between release of a personal injury claim and settlement of an insurance claim.
The circumstances of this case are not unlike those in rescission cases where courts have applied an exception to the rule requiring restoration of the consideration paid: "A restoration is not necessary, in order to avoid the bar of a release, where there is no question as to the right of the plaintiff, arising independently of the release itself, to retain what he received." (Sime v. Malouf (1949) 95 Cal. App.2d 82, 111, 112, 212 P.2d 946, 213 P.2d 788["[r]escission and restoration are required only under equitable principles and to prevent the taking of unfair advantage"]; *557 see Denevi v. LGCC, LLC (2004) 121 Cal.App.4th 1211, 1220, 18 Cal.Rptr.3d 276 [victim of fraud cannot be required to undo the transaction in its entirety; "he has the right to 'retain the benefits of the contract ..., and make up in damages the loss suffered by the fraud'"'" "he may affirm the contract, and simply sue for damages for the fraud'"].) This case, of course, is not a rescission case, and would not in any event fit precisely into the exception because, as State Farm points out, the amount of the claim settled for $1.5 million was disputed by State Farm, and it may be that the Association was not entitled to the entire amount. Nonetheless, because it was entitled to at least some portion of that amount, the exception to the restoration rule demonstrates that the Garcia/Taylor rule in personal injury eases should not automatically be applied in other contextsand particularly in the context of a fraudulently induced insurance settlement.[3]
State Farm contends that if a plaintiff can settle a disputed claim, keep the money paid and then sue on the released claim, "no defendant would pay to settle a disputed claim," and "all settlements ... of actual or threatened litigation can be rendered meaningless." State Farm both misstates its premise and exaggerates the consequences. Correctly stated, the effect of our holding in this case is that a plaintiff could settle a disputed insurance claim, keep the money paid, and then sue for fraud (rather than on the released claim) if it was fraudulently induced to settle the claim by a misrepresentation of policy limits. The consequences of applying this principle are not dire. Indeed, to avoid them, the insurer need only avoid misrepresenting policy limits when it settles claims. We seriously doubt insureds who settle their claims can be expected thereafter to assert groundless claims of misrepresentation of policy limits on a routine basis.[4]
State Farm points out that cases supporting the "keep the money and sue" principle do not involve the release of a disputed claim, and instead involve the sale *558 of a res, citing Persson v. Smart Inventions, Inc., supra, 125 Cal.App.4th at p. 1153, 23 Cal.Rptr.3d 335 [a shareholder who was fraudulently induced to sell his shares in a company was not required to rescind the stock redemption agreement and return the benefits he received under it in order to sue for fraud; the release in the agreement he was fraudulently induced to execute did not bar the claim]. Persson and similar cases, State Farm asserts, are different from cases such as this, where "the release was the sole object of the settlement agreement...." Again, we cannot agree that State Farm's distinction is either correct or relevant. Certainly State Farm's purpose was to obtain a release from any further earthquake damage claims by the Association, but that was not the "sole object of the settlement agreement," which also resolved State Farm's liability for its underlying contractual obligation. In other words, as we have previously noted, State Farm was not simply "buying peace" (Cilibrasi v. Reiter (1951) 103 Cal.App.2d 397, 399, 229 P.2d 394), as is the case with the release of a personal injury claim, but was simultaneously satisfying an underlying contractual obligation.

3. Policy considerations and out-of-state precedents.
Policy considerations lend considerable support to our conclusion that the Garcia/Taylor principlethat a fraudulently induced contract of release cannot be avoided without rescinding the contract and restoring the money paid for the releaseshould not be applied to an insurance settlement. These considerations are illustrated in a line of out-of-state cases holding that, even in a personal injury case, a defrauded party may elect between rescission and an independent action for damages. (E.g., Phipps v. Winneshiek County (Iowa 1999) 593 N.W.2d 143, 146 [election of remedies doctrine should generally be available to a defrauded party to a settlement agreement]; Matsuura v. Alston & Bird (9th Cir.1999) 166 F.3d 1006, 1008, fn. 4, mod. 179 F.3d 1131 [applying Delaware law to claim that settlement of products liability suits for property damage was fraudulently induced; "the weight of authority favors according defrauded tort plaintiffs an election of remedies" citing cases].)[5] Of course, we cannot and do *559 not question the continuing vitality of Garcia and Taylor as controlling statements of California law governing contracts of release in personal injury cases. But, as we have seen, insurance settlements are not personal injury cases, and sound reasons exist for treating them differently, and permitting the defrauded releasor to affirm the agreement and sue for fraud. Prime among these reasons is that, absent an action for fraud, many plaintiffs who have been fraudulently induced to enter into a settlement agreement "otherwise would be left with no practical remedy." (Matsuura v. Alston & Bird, supra, 166 F.3d at p. 1008, fn. 4.) As one court has observed, "[i]n many cases, plaintiffs have spent much, if not all, of the settlement sum on necessities before discovering the fraud." (DiSabatino, supra, 635 F.Supp. at p. 356.) This is just such a case, where the $1.5 million settlement monies have long been spent on earthquake repairs. Moreover, a rule limiting the remedy to rescission does little to discourage fraud:
"Simply as a matter of policy, this cause of action [alleging a settlement procured by fraud] should be deemed to exist. First, insurance companies would have everything to gain and nothing to lose by systematically defrauding tort claimants into accepting low settlement offers. In such cases the company gambles that the deceit will not be uncovered. If the fraud is uncovered, then the company only faces litigation, or the costs of reimbursement, that it would have had to confront without a settlement.... Moreover, such a rule would enforce a higher standard of care among insurance agents, thus helping to prevent cases of merely negligent misrepresentation." (DiSabatino, supra, 635 F.Supp. at pp. 355-356.)
In short, we see no good reason to extend the Garcia/Taylor rule to insurance settlements, and a number of good reasons not to do so.

4. The rule against speculative damages does not apply.
State Farm contends that permitting a plaintiff to affirm an insurance settlement and sue for fraud would run afoul of the rule against creating claims where damages are speculative, citing Taylor, supra, 207 Cal. at p. 103, 276 P. 990["[t]he difficulty in determining the amount of damages is insurmountable"]. State Farm says fraud damages will be speculative because we do not know the value of the Association's underlying claim, and to determine that value, the trier of fact will have to determine the nature and extent of the covered losses, thus "re-litigat[ing]" the contract claim and rendering "the release State Farm bargained for ... totally worthless." It is true the facts of the Association's contract claim must be litigated to show the value of the claim it releasedthat is, that the Association had, as it alleges, a valid, covered claim for damages exceeding $8 millionin order to establish the damages caused by the fraud. As the Association observes, the issue is what the claim was worth and whether the Association would have compromised a claim of that value had it known there were additional millions of dollars in coverage available. The Association's damages would be calculated based on the amount for which the parties would reasonably have settled had the Association known the actual policy limits. We fail to see at this juncture in the appeal any impropriety or speculation in this approach; there is no uncertainty of the type Taylor found in a fraudulently induced personal injury settlement, where the plaintiffs cause of action *560 would have had no value at all if the defendant was not negligent.[6] (Taylor, supra, 207 Cal. at p. 104, 276 P. 990; see also DiSabatino, supra, 635 F.Supp. at p. 355["[i]n any action based on fraud, the fact finder will simply measure the extent of the plaintiffs damages by examining what the agreement would have been, had the parties known the actual material facts"; the nature of injuries in a foregone tort action are relevant "only to the extent of how they would affect the value of the claim to be compromised in the context of the actual coverage provided by the defendant insurance carrier"].)
To summarize: The principles established in Garcia and Taylor, holding that a plaintiff cannot avoid a fraudulently induced contract of release without rescinding the contract and restoring the money paid as a consideration for the release, do not apply to a contract for the settlement and release of insurance claims, where the insurer is alleged to have induced the settlement by misrepresenting policy limits. Instead, the principle applicable to ordinary contractsthat a party induced by fraud to execute a contract has the option of rescinding it or affirming it and recovering damages for the fraudapplies. Any other conclusion would leave a defrauded insured with no practical remedy and would do nothing to discourage fraud in the settlement of insurance claims. Accordingly, the trial court erred in sustaining State Farm's demurrer to the Association's second amended complaint.[7]

DISPOSITION
The judgment is reversed and the cause is remanded to the trial court with directions to vacate its order sustaining State Farm's demurrer and to enter a new order overruling the demurrer. Village Northridge Homeowners Association is to recover its costs on appeal.
We concur: COOPER, P.J, and FLIER, J.
NOTES
[1] "The following are hereby defined as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance. [¶] (a) Making . . . any ... statement misrepresenting the terms of any policy issued...." (Ins.Code, §. 790.03, subd. (a).)
[2] State Farm suggests in its brief that its position on the underlying dispute was that Village Northridge suffered only $2,565,553.24 in damages (the amount the insurer had already paid, plus the deductible, prior to the settlement). But State Farm itself, in its summary judgment motion, expressly declared that, when the Association sought additional benefits in 1998, State Farm reinspected the property and determined "that a portion of the claimed additional damage might be earthquake related and that a portion was not."
[3] State Farm implies there is no longer an exception to the rule that restoration of consideration is necessary to rescind an agreement because, in 1961, California's rescission statutes were revised. The statute now states that, to effect a rescission, a party to a contract "must" restore or offer to restore the consideration (Civ.Code, § 1691), whereas it formerly provided that rescission can be accomplished "only by the use ... of reasonable diligence to comply" with specified rules, including the rule that "[hie must restore" everything of value. State Farm cites no authority supporting the view that this change operates to eliminate, or was in any way intended to eliminate, the principle that consideration to which the plaintiff has an independent right need not be returned. In any event, the question in this case is whether the Association may affirm and sue, not whether it may rescind.
[4] State Farm posits a scenario in this case in which (a) policy limits are found to be $11.9 million (rather than the represented $4.9 million), and (b) State Farm prevails at trial, and it is found that the Association's earthquake damages were only the presettlement amount of $2.5 million, which State Farm had previously paid. In this scenario, when eight years of interest is added on, State Farm would have "overpaid" the Association by $3.9 to $4.2 million. According to State Farm, this scenario demonstrates that the Garcia/Taylor principle, requiring the Association to return $1.5 million as a condition precedent to suing State Farm for fraud, "makes more sense and is more equitable to the parties." While any scenario is theoretically possible, we question the likelihood that State Farm's premises would come to pass. In any event, public policy considerations suggest that the risk of an overpayment by an insurer who is alleged to have misrepresented policy limits in obtaining a settlement is more acceptable than the risk that an insured will be deprived by fraud of the full insurance protection for which it paid.
[5] See also Gaskins v. Southern Farm Bureau Casualty Ins. Co. (2003) 354 S.C. 416, 419-420, 581 S.E.2d 169 [suit against insurer for fraudulently inducing settlement of claim against insured for personal injuries; "a majority of courts now recognize a tort against an insurance company for fraudulently obtaining a release"; "[a] primary reason why courts recognize the tort is to discourage insurance companies from engaging in fraud"]; DiSabatino v. United States Fidelity & Guaranty Co. (D.Del.1986) 635 F.Supp. 350, 352, 353 (DiSabatino ) ["tort claimant has an election to stand on a fraudulently induced release and proceed on a cause of action based on fraud"; "settlement agreement involving the release of a cause of action should be treated no differently from a fraudulently induced commercial contract in which courts routinely allow an election of remedies"]; but see Stefanac v. Cranbrook Educational Community (1990) 435 Mich. 155, 159, 458 N.W.2d 56 [when a plaintiff has entered into a settlement agreement, tender of consideration must occur before or at the time of a suit raising a legal claim in contravention of the agreement]; Ledbetter v. Frosty Morn Meats (1963) 274 Ala. 491, 498, 150 So.2d 365 [to avoid a release, plaintiff was bound to return the consideration within a reasonable time after discovery of the alleged fraud; if she were allowed to retain the benefits and reject the burdens, "[t]here would be no rescission in toto, no restoration of the status quo, notwithstanding the plaintiff was in a position to do so"]; Shallenberger v. Motorists Mutual Ins. Co. (1958) 167 Ohio St. 494, 502, 504, 150 N.E.2d 295 [it is illogical to affirm an agreement not to sue for personal injuries and yet recover something on account of those injuries; plaintiff must set aside his agreement not to sue and tender back the consideration]; Davis v. Hargett (1956) 244 N.C. 157, 161-162, 163, 92 S.E.2d 782 [plaintiff with a tort claim of undetermined merit who settled and released claim cannot affirm the settlement and sue for fraud].
[6] State Farm also relies on Cedars-Sinai Medical Center v. Superior Court (1998) 18 Cal.4th 1, 74 Cal.Rptr.2d 248, 954 P.2d 511 (Cedars-Sinai ), which cited Taylor, supra, 207 Cal. at pp. 103-105, 276 P. 990, for the principle that the court had, in the past, "considered the uncertainty of determining hypothetically whether a particular plaintiff would have prevailed on a legal claim as sufficient reason for refusing to recognize a tort remedy for other forms of wrongful conduct." (Cedars-Sinai, supra, 18 Cal.4th at p. 14, 74 Cal.Rptr.2d 248, 954 P.2d 511.) In Cedars-Sinai, the court refused to create a separate tort cause of action for intentional spoliation of evidence, observing it would be impossible for the jury to assess the role the missing evidence would have played in the determination of the underlying action. (Id. at pp. 4, 14, 74 Cal. Rptr.2d 248, 954 P.2d 511.) We cannot see any comparable impossibility in an ordinary fraud case.
[7] State Farm also contends the Association's second amended complaint does not plead fraud with sufficient particularity, because it does not identify who at State Farm misrepresented the policy limits, their authority to make the representation, and so on. However, the trial court did not sustain State Farm's demurrer on the ground of lack of specificity, which in any event has no merit. The objectives Of the specificity requirement in a fraud pleading are to give the defendant notice of "`definite charges which can be intelligently met,'" and to permit the court to determine whether a prima facie foundation exists for the charge of fraud. (Committee on Children's Television, Inc. v. General Foods Corp. (1983) 35 Cal.3d 197, 216-217, 197 Cal.Rptr. 783, 673 P.2d 660, citations omitted.) The Association's fraud claim is perfectly clear, and the facts are presumably within State Farm's own records. (See id. at p. 217, 197 Cal.Rptr. 783, 673 P.2d 660["[l]ess specificity is required when `it appears from the nature of the allegations that the defendant must necessarily possess full information concerning the facts of the controversy'"].)